1           UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF CALIFORNIA

3   Before The Honorable GONZALO P. CURIEL, District Court Judge

4
    UNITED STATES OF AMERICA,        )
5                                    )
                      Plaintiff,     )       CASE NO.
6     VS.                            )    3:20-cr-1227-GPC
                                     )
7   JENNINGS RYAN STALEY,            )
                                     )
8                     Defendant.     )
    ─────────────────────────────────)
9                                      San Diego, California
                                       Wednesday, August 5, 2020
10

11  APPEARANCES:

12

13  For Plaintiff:      UNITED STATES ATTORNEY'S OFFICE
                        880 Front Street, Suite 6293
14                      San Diego, California  92101
                        BY: JACLYN B. STAHL, ESQ.
15                          NICHOLAS W. PILCHAK, ESQ.
                            ASSISTANT UNITED STATES ATTORNEYS
16

17  For Defendant:      GRIFFIN LAW OFFICE, APC
                        180 Broadway, Suite 1810
18                      San Diego, California 92101
                        BY: PATRICK M. GRIFFIN, ESQ.
19                          ATTORNEY AT LAW

20

21

22

23

24

25  Reported by:        Ellen L. Simone, RMR, CRR, CSR No. 14261
                        Official Court Reporter

1          SAN DIEGO, CALIFORNIA; AUGUST 5, 2020; 1:00 P.M.

2                              -o0o-

3          THE CLERK:  Calling Item No. 9 on the calendar.  Case

4    No. 20-cr-1227.  U.S.A. v. Jennings Ryan Staley, on for an

5    in-person motion hearing/trial setting.

6          MR. PILCHAK:  Good afternoon, Your Honor.

7          Nicholas Pilchak and Jaclyn Stahl for the United

8    States.

9          MR. GRIFFIN:  Good afternoon, Your Honor.

10         Patrick Griffin on behalf of Jen Staley, who is

11   present in court, out on bond.

12         THE COURT:  Good afternoon, Mr. Staley, Mr. Griffin,

13   Ms. Stahl, and Mr. Pilchak.

14         We are here for a motion hearing, and I think it would

15   be overly ambitious to call this a trial setting, but certainly

16   a motion hearing.

17         And I've reviewed the moving papers seeking discovery,

18   the response, the additional supplemental papers in support of

19   the original request, or the response, perhaps, is what we'll

20   call it, to the government's position, and then a further reply

21   by the government.

22         And so this is how I see things.

23         At this point, the government reports that it has

24   produced 1,367 pages of written discovery, 10 gigabytes of

25   data, which included recordings, agent reports, bank records,

1   emails and text messages, and witness reports, and the

2   statements made by Dr. Staley to agents and reporting to

3   patients regarding the qualities or effect of the

4   hydroxychloroquine.

5          At this point, the government reports it has not yet

6   identified its trial exhibits, but is prepared to produce all

7   exhibits 3 weeks before trial.

8          And as to Rule 16, reports, or lab and scientific

9   reports, they indicate that they have produced such a report

10  relating to the subject hydroxychloroquine.

11         As of this moment, no experts have been identified,

12  and so at this point, the government proposes -- or I'm sorry,

13  before I get to that.

14         The government states that it has produced all Brady

15  that it's aware of today, and will thereafter turn over Giglio

16  and Jencks in a timely fashion.

17         And with respect to all of that, what the government

18  is proposing is, 6 weeks before trial, to produce notice of

19  proposed expert testimony, with defense then to follow suit 3

20  weeks before trial.

21         And then 3 weeks before trial, the government will

22  exchange with defense counsel witness lists, exhibit lists,

23  Jencks and Giglio, Rule 26.2, and Rule 404(b) material.

24         And then lastly, 2 weeks before trial, the parties

25  will exchange drafts, summary charts pursuant to Rule 1006

 1   identifying the underlying documents and admissibility.

 2          So that is what we have in the form of Rule 16, Brady,

 3   Giglio, 404(b).

 4          And before I move on to the more case-specific

 5   requests for discovery, including grand jury information and

 6   other requests, let me ask as to the state of discovery.

 7          Does the government want to supplement the record at

 8   all as to what has been produced?

 9          MR. PILCHAK:  Yes, Your Honor.  I do have some fresh

10   counts for the Court as of today.

11          Our count is, as of today, we've produced 4,288 pages.

12          THE COURT:  All right.

13          MR. PILCHAK:  So it's a bit more than the number Your

14   Honor cited, which I'm sure is from our papers several weeks

15   ago.

16          And the data count of the discovery that's gone on so

17   far is 13.8 gigabytes.

18          But all the statements the Court recited about our

19   representations of the state of discovery under the rules,

20   Brady, is, and remains, accurate.

21          THE COURT:  All right.  And so then, given my

22   recitation of the government's position and what's been

23   provided and proposed to provide, what is the view of defense

24   counsel as to whether or not there are any orders that you

25   believe that the Court should enter that do not coincide or

1   otherwise reflect what the government is prepared to do?

2          MR. GRIFFIN:  Yes, Your Honor.  I think that the

3   timing the Court laid out makes sense to us.

4          I don't know if we're getting ahead of ourselves here,

5   but there's still some ongoing investigation, of course.

6          At the conclusion of today, we're going to ask for a

7   status hearing to be set.  I can get into that later on, if

8   Your Honor wishes, but I believe it may be even more

9   appropriate to lock in a bit more of the scheduling,

10  potentially, at that status hearing, if the Court is willing to

11  grant us that.

12         And again, I can proffer some reasons for that at the

13  conclusion of the hearing, or now, if Your Honor would like to

14  hear them.

15         THE COURT:  That's fine.

16         So we will set the matter for a status hearing at the

17  conclusion of these proceedings today, and then we will be in

18  a, perhaps, better position to determine whether or not we

19  should make adjustments in what otherwise is being proposed by

20  the government.

21         And then, I think that leaves us with, if not the big

22  ticket items, the requests that appear to be in dispute.

23         And beginning with the case-specific requests for

24  discovery relating to grand jury information, there appear to

25  be 7 separate requests relating to the grand jury information.

1          And I guess one place where they are nicely summarized

2    as to what the request is, and the government's response, is at

3    pages 15 and 16 of the government's response to defendant's

4    motion.

5          And so that being the case, let's go down the line

6    with the 7 requests.

7          The first request is for, "All communications with

8    grand jurors from the government or the Court between March 17

9    and May 20."

10          The government's response is that it is aware that

11    Chief Judge Burns communicated safety precautions to the grand

12    juror, and ordered that they return, and the government

13    indicates it can submit a copy of these precautions in-camera

14    for the Court to review, if it does not have a copy.

15          I don't have a copy handy.

16          And then, to the extent that the government's prepared

17    to provide the Court with a copy, then the question is, is the

18    government otherwise prepared to provide those communications

19    from Chief Judge Burns regarding safety precautions to the

20    defense, or is there something about these communications that

21    the government believes does not warrant their disclosure at

22    this time?

23          MS. STAHL:  Thank you, Your Honor.

24          The government's position is that, even as to Request

25    No. 1, these materials must be kept secret.

1          This exact request was made of Judge Battaglia in a

2    case just a few weeks ago, and the government attached the

3    transcript of those proceedings to its supplemental response.

4          And while we understand this Court is, of course, not

5    bound by that decision, that decision is regarding this exact

6    same discovery, and there are several reasons that I could get

7    into arguing more fully, or if you want to go item-by-item.

8          But with respect to this item, the Ninth Circuit and

9    the Supreme Court have said that defendants are entitled to the

10   initial jury charge or jury instructions that a court gives to

11   the grand jury.  This is not that.  This is housekeeping

12   matters at the very bottom, if not more than that.

13         Without disclosing the actual basis -- without

14   disclosing what is in that document, I can't particularly

15   argue, that's why we have stated that we could submit it

16   in-camera and provide more reasons, but it's a little bit of

17   a --

18              THE COURT:  All right.

19              MS. STAHL:  -- issue I can't discuss publicly.

20              THE COURT:  All right.  So at this point then, let me

21   turn to defense counsel and inquire as to this request, as to

22   the justification for the request:  "All communications with

23   grand jurors from the government or the Court for a two-month

24   period beginning March 17 and ending May 20."

25         What authority do you have to support this request?

1              MR. GRIFFIN:  Thank you, Your Honor.

2         And before I begin, I guess I'd like a point of

3    clarification from the government.

4         Our request was for all communications.  I guess I'm

5    curious if, in the United States box here where they talk about

6    the response, whether or not that this is essentially what they

7    believe to be all communications or were these just safety

8    precautions?  That's, kind of, one clarification I'd like to

9    ask.

10        But with respect to the actual underlying potential

11   motions to be brought, of course, we're doing this pursuant to

12   Federal Rule of Criminal Procedure 6(e), and we're asking for,

13   as the government put, housekeeping matters.  Right?

14        So the secrecy for the grand jury is very important

15   for the substantive discussions, but we're asking for

16   essentially, the administrative type of information.

17        But with respect to this is, it would be to challenge

18   the indictment based upon what we don't know yet.  Right?

19   Because the information is not available to us.

20        But as this Court's aware, you know, there's several

21   different avenues to challenge indictments based on

22   cross-section, you know, and, I guess, essentially, any undue

23   influence, whether or not there were all of the -- who was

24   actually present, quorum, various different issues, but the

25   government is now the gatekeeper of this information.

1          And so, again, we are not asking for anything about --

2     that falls under the secrecy shield.  This is all

3     administrative and housekeeping type of information that could

4     have affected the grand jury's deliberations.

5          THE COURT:  So the government points out that these

6     motions for discovery cannot just amount to fishing expeditions

7     and requesting all documents relating to the work of a grand

8     jury, to the communications with the grand jury as to their

9     service without something articulated to support the request.

10         And it does seem that there is a lack of justification

11    provided as to most, if not all, of these requests.  And

12    certainly, from the requests themselves, one can imagine that

13    they may have a connection with a possible motion to dismiss

14    based upon grand jury composition, based upon other grounds.

15         But at the same time, to the extent that it requires

16    surmising on the part of either the government or the Court, it

17    doesn't lend itself to making a strong record.  It doesn't lend

18    itself to have the Court find that there have been articulated

19    grounds which justify this form of discovery, which I don't

20    think anyone disputes is not normally, commonly, regularly

21    provided, and in that sense, it is extraordinary.

22         And so how do you respond to the notion that you have

23    insufficiently articulated the basis for these materials?

24         MR. GRIFFIN:  Right.  I'll point Court and counsel to

25    page 16 of our original motion for discovery.  We would lay out

1   3 cases here that cover some potential challenges that can be

2   made.

3         And we agree with the Court that this is

4   extraordinary.  Right?  The only reason we're asking for these

5   materials is because of the unique situation that our country

6   is in right now.  So but for the pandemic, but for the Court

7   closures, this request would not be made.  Right?

8         So what we are trying to do is to flush this out.

9   Because the constitution still applies.  The due process still

10  applies.  And we want to make sure that everything was done,

11  you know, as this -- as the grand jury normally operates.

12        And we lay these out, and I can -- I don't need to

13  repeat -- to save the court reporter a bit here -- but, you

14  know, the *Bank of Nova Scotia* case, you know, presumption of

15  prejudice when the structural protections of the grand jury

16  have been so compromised as to render the proceedings

17  fundamentally unfair.

18        THE COURT:  Well, what do you have that these

19  structural protections of the grand jury have been compromised?

20        MR. GRIFFIN:  Well, and again, this is why we're

21  making the request.  But one possible would be that this is a

22  grand jury that's being called back in in the middle of a

23  pandemic to weigh on, to render judgment regarding COVID.

24  Right?  We're getting to this case --

25        The heart of this case is about a COVID fraud.  So if

1    there are certain instructions that could have been made that

2    could taint this jury as to the dangers, if there are any, you

3    know, questions about what medications they're taking.  So the

4    subject matter of this criminal case is also the subject matter

5    as to why the grand jury was called out of session or was

6    temporarily halted to begin with.

7         So that could be one potential area that could have a

8    direct impact with -- case-specific to this.  So not a fishing

9    expedition, but specific to this exact case that we have.

10        THE COURT:  Well, I mean, other than the fact that

11   certainly no one can disagree that we are in the midst of a

12   COVID-19 pandemic, and that as a result, it's impacted the

13   Court and the grand jury's ability to go about its duties.

14        Aside from that, you don't have any specific reason to

15   believe that something has happened which gives rise to a basis

16   to learn about all of the communications that have been had

17   with the grand jury from the Court's side, from the

18   government's side, do you?

19        MR. GRIFFIN:  Well, and therein lies the issue with

20   the discovery request, Your Honor, pursuant to Rule 6(e) and

21   16, forcing us to litigate the merits of a potential motion

22   without the ability to have the underlying facts.

23        But what I can point to as a specific concern is the

24   pandemic itself.  And again, I think that the nature of the

25   secret proceedings preclude us from having this specific

1   information.

2          And again, I think that's what's important about --

3   you know, if the government is ordered to turn over this

4   information, and it turns out that this information did not

5   taint the grand jury or there was no structural deficiencies to

6   the grand jury, then that ends the analysis.

7          And there's protective orders that are in place to

8   cover this.  We already stipulated to a protective order in

9   this case.

10         And so for this analysis before the Court today, it's

11  just a simple discovery analysis.  And I would love to answer

12  the Court's questions and give exact answers, but we're not

13  challenging any -- we're not challenging the substance of the

14  grand jury, we're challenging the procedural and administrative

15  mechanisms, and that's all we're asking for, as well.

16         So I think that that would hopefully entitle us to --

17  again, it's a low showing that we must make for this to be

18  discoverable.  And again, that's under both the 6(e) and Rule

19  16, could it be helpful to the defense.

20         THE COURT:  But I don't think could be helpful then

21  opens things up to a fishing expedition.

22         And at the same time, I do appreciate that we are

23  living during unprecedented times.  Right?  No one can dispute

24  that the courts have never before shut down in the manner that

25  they did between March and May or June.

1    And then on top of that, this case, unlike that of the

2    case before Judge Battaglia, happens to involve charges that

3    themselves relates to COVID-19.

4    And so that coincidence, that simultaneous bringing

5    together of the events of today with the charges here, does

6    require the Court to look at this a little bit closer than it

7    might otherwise, but at the same time be mindful of 6(e), being

8    mindful for avoiding fishing expeditions.

9    And so let me do this.  Let me ask the government to

10   produce the precautions in-camera, and I'll review those and

11   see if there is something that, in the Court's view, is

12   discoverable.

13   And then following up on the question posed by

14   Mr. Griffin.

15   I expect that there's probably any number of

16   communications that are made, either from the Court or the

17   government, to let the grand jurors know when to report, and

18   then once they arrive, you know, tell them where to proceed,

19   and so there's any number of communications.  I expect that

20   most of those aren't necessarily memorialized.

21   But are you aware of any additional communications

22   that would be the subject of this request?

23   MS. STAHL:  Your Honor, so I think that's exactly what

24   I was trying to get at with housekeeping.

25   So matters on where they meet, when they meet, those,

1    of course -- they don't just magically show up.

2           In fact, when they return a true bill, the Court

3    orders them to come back.  That is a matter of public record.

4           But in -- like, where are you going to go, where are

5    you going to park, that information, the defense isn't entitled

6    to it because there's no basis.  It's not relevant or material

7    in this case.  That is simply -- it's not a court document,

8    it's not presumed public, it has nothing to do with grand jury

9    proceedings.  So when I said "housekeeping", I was specifically

10   talking about those types of matters.

11          And with respect to being very sensitive to the unique

12   nature of this case, that's why we mention the Chief Judge's

13   particular safety precautions.  Because maybe that possibly

14   touches on this case, and that's why we wanted to offer the

15   Court a chance to review it in-camera.

16          Our position is that is still not discoverable.  The

17   defense is not entitled to that.  But it is, in that manner,

18   not something that the defense is routinely entitled to or that

19   they have cited any reason why they would be entitled to it.

20          THE COURT:  So let me ask you with respect to only

21   communications that are made to the entire grand jury, if not

22   the entire grand jury that has been summoned, the entire grand

23   jury that may be present at any particular session or time.

24   Are you aware of any further communications that were made to

25   that group of grand jurors beside these safety precautions, and

1    then besides those things that occur at the grand jury which

2    are clearly covered by Rule 6(e)?

3            MS. STAHL:  So, Your Honor, I believe the Court has a

4    grand jury administrator who works with, okay, if, on any given

5    day, the grand jury is not going to meet quorum, well, then it

6    is discussed -- we don't need less than quorum to show up just

7    to find out we don't have quorum.

8            I believe there are those types of communications.

9    I'm not privy to them.  I don't know in what format they take

10   place.  And our position is, even if those occurred, the

11   defense is not entitled to those.

12           THE COURT:  All right.  Because ultimately, it seems

13   to me that it's difficult to call upon the government to

14   identify every communication -- all communications with grand

15   jurors from the government or Court over a two-month period.

16   Because then, if it turns out that on April the 22nd there was

17   a telephone call, one of the grand jurors called in to the

18   clerk's office, and then we suddenly learn about that, then the

19   response is, see, you failed to identify a communication.

20           So it seems to me that all we can do is ask the

21   government to take reasonable steps to identify communications

22   made to the full grand jury composition or the members of the

23   grand jury that are present at one time.

24           So I'll ask you to follow up on that and determine

25   whether or not there are such communications, and if there are,

1   then you can let the Court know what they are, and then what

2   your position is with respect to whether or not that is

3   something that can be turned over.

4          But at this point then, it sounds like the only thing

5   that we have identified is the Chief Judge's safety precautions

6   to the grand jurors, and so I'll ask that those be submitted

7   in-camera, and I'll review those.  All right?

8          MS. STAHL:  Of course.

9          THE COURT:  And then I believe that addressed the

10  first request.

11         And then the second is, "Any charges, instructions, or

12  information provided to the grand jury on May 20, 2020."

13         And it strikes me that those requests are squarely

14  matters that occurred before the grand jury which are presumed

15  secret pursuant to Rule 6(e).

16         At the same time, you are entitled to the initial

17  charges given to the grand jury when it was impaneled.

18         Have those been provided or will those be provided?

19         MS. STAHL:  Your Honor, I don't believe a request has

20  been made.  This request limits it to May 20th, 2020.  This

21  grand jury was impaneled in January 2019.

22         THE COURT:  All right.  That's a fair response.

23         And so then let me hear from Mr. Griffin.

24         Do you believe that there's something about this case

25  and something that you have pointed out in your papers which

1   demonstrates that you are entitled to the request in Request

2   No. 2?

3         MR. GRIFFIN:  Yes, with respect to the charges, Your

4   Honor, and I believe that May 20 date was just taken -- I

5   believe that is the -- I don't actually know --

6         MR. PILCHAK:  It's the date the indictment was

7   returned, Your Honor.

8         MR. GRIFFIN:  Right.

9         THE COURT:  May 20?

10        MR. GRIFFIN:  Right.  Because this case did start with

11   a complaint, Your Honor.

12        So I guess I would make that request specifically and

13   not have to have it tethered to the May 20.

14        But same issue here, Your Honor.  Again, this is -- we

15   understand it's a unique request that we're making.  And when

16   the government represents that there's no showing at all from

17   us on why, again, I'll keep pointing to the fact that this is a

18   hydroxychloroquine COVID fraud case that was returned -- I

19   think the first indictment returned back, so it's just --

20   that's my response to, again, really the rest of what's -- we

21   have asked for.  You know.  All 7 different itemized requests

22   fall under that umbrella as far as the defenses.

23        But if I had specific information, Your Honor,

24   obviously, we -- I guess, maybe the Court can steer me a little

25   bit with that as far as, is -- there's no way for us to know,

1  is what I'm getting at

2         THE COURT:  And fishing expeditions always involve a

3  certain level of lack of knowledge and a desire to obtain

4  knowledge, and therefore, requesting matters that are not

5  otherwise identified under Rule 16, Brady, or otherwise.

6         And so, you know, I understand why -- what leads you

7  to make the request is the fact that you don't have anything

8  that is somehow related to the case, but I don't think that

9  just establishing a nexus between a case and a request

10  thereafter justifies or supports -- sufficiently supports a

11  request for material that otherwise is covered by Rule 6(e).

12         And I guess the question is, why do you think there's

13  something about the instructions or information provided to the

14  grand jurors on May 20 that is such that it would overcome the

15  presumption that it should remain secret, other than just this

16  nexus you have, COVID-19 being experienced throughout the

17  world, these charges relate to COVID-19?

18         MR. GRIFFIN:  Right.  And again, it's because of, you

19  know, procedural issues.  Because of --

20         Again, when we first drafted this, we've, you know,

21  since been paying attention to other districts and learning

22  about potential issues that -- kind of, more of a rumor mill

23  with respect to how grand juries were proceeding.

24         And really, just the query of are they all coming?  I

25  mean, essentially, the issues of -- of the grand jury, the

1  makeup of it, and with respect to this case is any specific

2  instructions that could have somehow influenced them with

3  respect to this case.

4          And that's really the heart of what we're after here

5  is, you know, imagining some instruction given to them of --

6  you know, that has something to do with medications pertaining

7  to COVID, and not showing up to the grand jury if you've taken

8  a medication that, you know, we don't -- something along the

9  lines of that where there could be some specific instruction

10 given that could somehow poison the fair administration of the

11 grand jury.

12         THE COURT:  Well, certainly, one would expect that

13 safety protocols were followed and, to that extent, that grand

14 jurors would have been asked whether or not they either had

15 COVID-19 and were suffering from physical symptoms that were

16 perhaps consistent with COVID-19, that they lived with someone

17 with COVID-19, or they lived with someone that was exhibiting

18 symptoms of COVID-19, that there was something about their life

19 which placed them at greater risk to COVID-19.  That these

20 questions would be asked, not only of the grand jury, but

21 they're asked perhaps even when you enter the courthouse,

22 you're asked when you arrive at different places.

23         And so to the extent that those -- one can assume that

24 those questions were asked, then the follow-up question is, all

25 right, so then how would that make these proceedings

1    fundamentally unfair and create defects in terms of the

2    structural protections that are otherwise required?

3            MR. GRIFFIN:  Another example could be just the fact

4    of the different cross-sections.  Right?  The fact that there

5    needs to be a fair cross-section for a grand jury.

6            And we know that COVID has impacted different

7    communities of color different ways, different socioeconomic.

8            And so if for some reason that the COVID crisis did

9    not present a fair cross-section of the community, that is one

10   example of a potential -- you know, a potential structural

11   issue with the grand jury.

12           THE COURT:  Which is interesting.  I understand your

13   point that certain parts of the community have been impacted

14   more than others, and one can just look at the charts, the maps

15   and diagrams of the incidence of COVID-19 infections and see

16   that South Bay down near the border is probably anywhere

17   between 5, 6, 7 times greater in terms of incidence of COVID

18   compared to Point Loma, compared to La Jolla.

19           And so let me see if I understand.  To the extent that

20   that reality impacted the grand jury composition so that, while

21   the grand jury was initially composed in a perfect fashion that

22   is, you know, acknowledged as being a proper, kind of,

23   cross-section of the Southern District of California, that, to

24   the extent that there was a 10 percent or a 20 percent or a

25   30 percent differential in what we actually had for the grand

1  jury that returned the indictment in your client's case, is

2  there some understanding that the law would strike down the

3  indictment as being unfair or compromised given that the

4  government didn't do anything to create these conditions, that

5  it was the mere unavailability of grand jurors on a particular

6  day that may have created this scenario?

7          How is it that the law would allow the Court to strike

8  down this indictment?

9          MR. GRIFFIN:  And Your Honor, the case on that is

10 *United States v. Torres-Hernandez*, cited on page 16.  And that

11 court talks under the Sixth Amendment analysis where it's

12 essentially just that it requires that the grand juries reflect

13 a fair cross-section.  So --

14         THE COURT:  So does that mean the original grand jury

15 that was impaneled, or does that mean that the grand jury that

16 returns an indictment on a particular day, so that in every

17 case now we're looking to see if, okay, well, the original

18 composition of the grand jury was fine, but then on May the

19 2nd, there were 3 Hispanics that did not arrive at the grand

20 jury session, and therefore, it skewed the balance in a

21 particular way that the defense argues has denied them a fair

22 cross-section?

23         MR. GRIFFIN:  Right.  And I think that that's, you

24 know, again, more of the issue for the substantive motion, but

25 as far as theoretically discussing the Court's question, you

1  know, this is a unique grand jury for several respects.

2  Because although it was impaneled prior, it sat out the entire

3  pandemic, essentially, initial closures, being sent home.

4         And I don't know the makeup or what took place when

5  they came back, or how long, but essentially, if it came -- if

6  the grand jury came back, there was a very small cross-section,

7  they squeezed out this one indictment because there was not,

8  from what I can tell, very many new cases filed during this

9  time.  They were generally border busts, things like that.

10        So the need to get an indictment on this, that's an

11 interesting issue, I guess.  And what I'm curious about is, did

12 they come back -- did they just produce this one indictment

13 just because of some time issues?

14        Because I had originally raised some speedy trial

15 issues, Your Honor, when we first appeared, and I don't know if

16 the government took that as a need --

17        Like, for instance, we were -- many defendants were

18 waiving and agreeing to continuances that we did not in this

19 case, and I know that the government could have been under

20 pressure to essentially get in --

21        THE COURT:  So it sounds like you've already provided

22 an explanation why the government may have proceeded in this

23 case to obtain an indictment, given your position.

24        MR. GRIFFIN:  Right.  And I guess what I'm curious

25 about then is -- is, again, back -- and this is just -- right,

1  could be the cross-section.  We do not know.

2        And I think, again, what separates this from a fishing

3  expedition is COVID.  Is this entire unique situation where

4  what we're just trying to do is flush out and make sure --

5        And it very well could be.  You know.  And I think

6  that we need to concede that to the Court and to the government

7  that they could turn over these records, and everything could

8  look -- could look appropriate, and I think that that is the

9  fair administration of justice in this case to err on that side

10 as opposed to finding out down the road or somehow learning

11 that there was potentially an error.

12       Because, again, if nothing is there, there's no motion

13 for us to file.  And we're not asking for the type of secret

14 information that is held so dear to the court system and the

15 federal jurisdictions because we're not asking for that -- that

16 secret, you know, confidential information that's being

17 exchanged about the substantive nature of the case.

18       THE COURT:  But it seems that, with respect to matters

19 occurring before the grand jury, which would include some of

20 what you're requesting, that we begin with a presumption.  You

21 agree that the presumption is it should not be turned over?

22       MR. GRIFFIN:  I believe that's -- yeah, I think that's

23 codified, Your Honor.  I agree that that's the state of the

24 law.

25       THE COURT:  And then, to the extent that that's the

1   case with respect to matters that occur before the grand jury,

2   are you saying that you're not requesting anything that

3   occurred before the grand jury?

4           MR. GRIFFIN:  No.  I think it was careful crafting of

5   these 7 items, Your Honor, because in crafting these, my aim

6   was to, you know, understand the importance of secrecy and

7   understand why these rules exist and to be careful that I don't

8   wade too far afield with that.

9           And that's why all of the different requests in here

10  are all tailored to that narrow, narrow request of discovery.

11          And I think if I came in with a -- with a broad

12  request and trying to use COVID as that, that's why -- COVID

13  and these requests are -- they go hand and glove, Your Honor.

14  Because the only reason that we feel that these 7 are relevant

15  is because of the unique situation with COVID and how it

16  dovetails with the facts of our case.

17          THE COURT:  But we're talking about 2 different

18  things -- aren't we? -- in terms of relevancy and then in terms

19  of presumptions of grand jury secrecy?

20          The presumption of grand jury secrecy, I would take

21  it, trumps Rule 16, unless you can demonstrate something about

22  occurrences before the grand jury that would ultimately prevail

23  over the 6(e) presumption.

24          It's not a rebuttable presumption, but it is a

25  presumption, and then it requires the defense to articulate

 1  grounds which justify overcoming that presumption.

 2          And at this point, the facts that are provided are

 3  essentially, you know, COVID-19 pandemic, COVID-19-related

 4  charges, a limited number of indictments, perhaps 1 or 2 or 3,

 5  during this timeframe, and therefore, that gives rise to

 6  something that overcomes the presumption.

 7          At the same time, I end up having these questions

 8  about, all right, well, so best case scenario for you, if you

 9  were able to demonstrate that 3 or 4 or 5 of the grand jurors

10  who were Hispanic, who came from the South Bay, were not

11  present on the day that the indictment was returned, but you

12  otherwise had a quorum, and you otherwise had enough people to

13  find that there was probable cause for the indictment, what

14  then?  How does that help the defendant with his motion to

15  dismiss?

16          MR. GRIFFIN:  Well, I guess I don't necessarily agree

17  that that would be the best case scenario about we could --

18  what could be uncovered through this.

19          And we cover this a little bit in our responsive

20  pleading, Your Honor, on page 3.

21          Most of the case law with respect to this, you know,

22  is other -- third parties, and this is a civil case that the

23  government cites.

24          You know.  What we're dealing with here is -- is the

25  party making this request, Dr. Staley, is the defendant in this

26

1  case, and so I think that we can -- you know, what we could

2  potentially uncover through this, you know, is just different

3  types of, you know, again, instructions, and we've talked about

4  the cross-section, but ultimately, Your Honor, it -- the reason

5  why the presumption isn't, I don't think, applicable here is

6  because the specific requests we're making are not for the type

7  of material that needs to be secret.

8       THE COURT:  All right.  So your request is to any

9  charges provided on May 20, 2020, and as I understand it, at

10  this point, you are expanding the request to refer to any

11  charges provided to the grand juries -- grand jurors that ended

12  up returning an indictment in this case.

13       And the government would be prepared to provide that?

14       MS. STAHL:  I apologize, Your Honor.  I think there's

15  some confusion on that point.

16       THE COURT:  Okay.

17       MS. STAHL:  So with respect to the initial charges at

18  the time the grand jury is impaneled, which here was in

19  January 2019, that is what the defense would be entitled to.

20       THE COURT:  Right.

21       MS. STAHL:  That is what we're prepared to turn over.

22       THE COURT:  Right.

23       MS. STAHL:  There was no additional charges --

24       THE COURT:  No.  That's what I understood.

25       MS. STAHL:  Okay.

 1            THE COURT:  Yes.

 2            MS. STAHL:  I apologize.  I thought we were talking

 3   about May 20th.

 4            THE COURT:  No.  I thought you understood that the

 5   initial charges that were referenced by the government did

 6   not -- were not presented on May 20th, 2020.

 7            MR. GRIFFIN:  Yeah.

 8            THE COURT:  And with that understanding, then you were

 9   modifying your request for the initial ones from 2019.  And to

10   the extent that that is what you did, you modified your

11   request, and the government is prepared to provide that, I will

12   ask you to provide that.

13            MS. STAHL:  And again, just to preserve the record, we

14   don't believe this is relevant, but we acknowledge that the

15   Court is ruling in accord with the Ninth Circuit.

16            THE COURT:  All right.  And so to the extent that

17   that's the Ninth Circuit's view, I'm duty bound to follow Ninth

18   Circuit law, so I will.

19            And then as to instructions provided to the grand

20   jury.

21            MR. GRIFFIN:  And I can probably clarify that a

22   little, Your Honor.

23            THE COURT:  Go ahead.

24            MR. GRIFFIN:  When this was first drafted, and we're

25   learning a little bit more, is we weren't certain, and we still

1   aren't exactly certain, if some of this was trying to be done

2   with, you know, video or various type of other mechanisms that

3   could have somehow interfered with, again, the fundamental

4   structure of it -- of the grand jury.

5        So I'm not sure if the government -- I believe I saw

6   something in their moving papers, or maybe it was a

7   conversation I had, but -- they may be able to clarify that

8   point -- but that's part of our request when we -- again, when

9   we're looking at this grand jury, we were wondering, well, how

10  did this come to be?  You know.  How did this -- and one of

11  those issues -- and that deals, kind of, a bit more with quorum

12  and what can qualify as that.  So that's what we're getting at.

13       THE COURT:  So when you're asking for instructions,

14  are you asking for the instructions -- the legal instructions

15  that were provided to the grand jury or some other type of

16  instructions as to what to do and how to do it?

17       MR. GRIFFIN:  I guess, both, Your Honor.  And the --

18  of course, I think the instructions -- the legal instructions

19  are relevant and necessary, but more tailored to, kind of, the

20  uncertainty of the makeup of this grand jury would be, you

21  know, more broad than that with instructions on, you can appear

22  by Zoom, or you could appear by telephone, or something along

23  those nature -- along that -- along that --

24       THE COURT:  Well, let me ask.

25       MR. GRIFFIN:  (Inaudible).

```
 1              THE COURT:  The grand jury did not convene by Zoom,
 2    did they?
 3              MS. STAHL:  No, Your Honor.
 4              MR. GRIFFIN:  And I believe that's -- the -- of
 5    course, when we first were flushing this out, we don't have --
 6    we didn't have that information, but we had heard, kind of,
 7    from the rumor mill that that may be something that they
 8    would -- that they were looking to do.
 9              THE COURT:  All right.  So at this point, we know now
10    that --
11              MR. GRIFFIN:  Right.
12              THE COURT:  -- there was not a Zoom or video convening
13    of the grand jury.
14              As to legal instructions, at this point, I'm prepared
15    to find that there is not sufficient or articulated basis to
16    overcome the presumption.
17              It does not appear that there would be any need for
18    any special instructions in light of the pandemic, that the
19    government would just be prepared to do what it does in every
20    other case, instruct the jury on the law, and then, with that,
21    allow the jury -- grand jury to decide whether or not there's
22    probable cause to support the indictment.
23              And as far as more information, I find that that's too
24    vague to support an order directing the government to provide
25    any information provided to the grand jurors.
```

1          It kind of coincides to some respect to the first

2    request with all communications with grand jurors.  We have

3    made some progress in terms of refining that, and the Court has

4    directed the government to follow up on that, so it appears

5    that the request for information would also follow suit.

6          Next is number 3, "Information regarding the

7    conditions in the grand jury room or rooms."

8          Do you have some reason to believe that the conditions

9    of the grand jury room were unhealthy?  Were somehow

10   compromised?  That they were such that they led the jury to do

11   something that they otherwise weren't prepared to do?

12         MR. GRIFFIN:  And Your Honor, again, this kind of goes

13   more towards what I was getting at earlier just about, you

14   know, how -- was there something done, potentially, that could

15   have interfered with that.  Some, you know, different rooms.

16         I mean, again, we have to, kind of, backtrack a little

17   bit back to, you know, April, May, and everything was a bit

18   different there.

19         So that's what we were requesting with that, and that,

20   kind of, also dovetails with our curiosity about the Zoom or

21   video, and that, obviously, was answered, so I don't have

22   anything specific on that, Your Honor.

23         THE COURT:  All right.  So at this time, without more,

24   I'll deny this request.

25         And then, "The number of grand jurors present during

1   the May 20th proceeding."

2          The government ensured that there was a quorum for the

3   grand jury, I expect?

4          MS. STAHL:  Yes, Your Honor.  There was a true bill

5   entered publicly.

6          THE COURT:  And that was done publicly and reported

7   back to the magistrate judge who took the indictment.

8          So beyond the establishment of a quorum, it does not

9   appear that there is anything that would support an order as to

10  the number.  The extent that there was one over the quorum, or

11  five over the quorum, it wouldn't be the basis for a motion to

12  dismiss.

13         That would be my tentative.  Do you wish to be heard

14  further on that, Ms. Griffin?

15         MR. GRIFFIN:  I do not, Your Honor.

16         THE COURT:  And then next, number 5, is to, "Advise

17  the defense of the number of grand jurors present at the same

18  time, or if the government used the deposing of witness

19  approach."

20         I would be prepared to follow my ruling as to Request

21  No. 4 to the extent that, at the end of the day, there was a

22  quorum, and it was reported back to the magistrate judge who

23  took the true bill, or accepted the true bill.  I would be

24  prepared to deny that request.

25         Do you wish to be heard further?

1          MR. GRIFFIN:  I submit on that, Your Honor.

2          THE COURT:  Okay.  And then number 6 is, "If the grand

3    jurors were advised that only government witnesses could be

4    called to testify."

5          It seems that this is non-COVID-19-related, and it's

6    just a general request that doesn't find any support, even as

7    to the theory that's been provided for the other requests that

8    relate to the COVID-19 pandemic.  I'm not prepared to grant

9    that request.

10         And then nor the -- well, I'm not prepared to grant

11   the sixth request.

12         And anything else, Mr. Griffin, on that one?

13         MR. GRIFFIN:  No, Your Honor.  I submit.

14         THE COURT:  And then the seventh is, "Lists of the

15   grand jurors on the panel who participated in the May 20th

16   proceedings, which includes race, gender and age."

17         And I think that more closely corresponds to this

18   motion regarding a representative cross-section of the grand

19   jury, and then it has me return to my question, which is, to

20   the extent that the composition of the grand jury was fine when

21   it was first convened, what law would support -- other than, I

22   guess, *Torres-Hernandez* -- but what law would allow the Court

23   to take these snapshots for every time a grand jury returns a

24   true bill to determine the ethnic composition of the grand

25   jury?

1          MR. GRIFFIN:  And really, what this would be, Your

2    Honor, is almost that there was no longer a full panel.

3    Essentially, if this was just a small cross-section brought in,

4    it essentially materially changed the full panel.

5          If there was some correspondence that said, hey, we

6    only need this amount, everyone else may be excused, that

7    perhaps that -- or that the general panel is no longer -- has

8    changed, and has now morphed into this, and because of the

9    COVID situation, that this wasn't just, okay, we happened to

10   pick X amount from the panel at large, and they all happened to

11   meet this one demographic.  But I could envision a scenario

12   where that would be it.  That whatever panel sat on this was

13   the panel at this given time because of any sort of

14   instructions or changes that were made in order to -- you know,

15   to speed up this process, to be able to get in in a certain

16   amount of time to return this indictment.

17         THE COURT:  It seems like a novel position that, by

18   virtue of absences by grand jurors on a particular date, that

19   that then would translate that this is the new panel versus

20   just that it is a quorum based upon jurors who have been

21   previously impaneled.

22         I'm not sure if there's any support for that in the

23   law.  Are you familiar with any case that stands for that

24   proposition?

25         MR. GRIFFIN:  You know, in a case we cited earlier,

1   it's --

2         THE COURT:  *Torres-Hernandez*?

3         MR. GRIFFIN:  Right.  And if the Court needs some

4   additional briefing, we'd be happy to do that.

5         THE COURT:  But isn't *Torres-Hernandez* focused more in

6   terms of the composition of the full grand jury versus, again,

7   a snapshot on Day 78?

8         MR. GRIFFIN:  Right.  I believe so.  But I think that

9   more -- the most important takeaway is just that fundamental

10  principle, and that's why I don't think there's a mechanical

11  application of this, and I think that the unique circumstances

12  of this case could give rise to a challenge based upon the

13  reasoning in the Sixth Amendment justifications for this, Your

14  Honor.

15        THE COURT:  Okay.

16        MR. GRIFFIN:  And again, I think this request is

17  easily our most narrowly tailored, that this -- this -- the

18  list would provide almost nothing as far as any substance or --

19  I mean, it's -- it would be just a list that would really just

20  state race, gender, age, and that's it.  And I think that

21  that's something that could be turned over, and it would have

22  zero impact on the ultimate secrecy issues and --

23        THE COURT:  How do you respond to the government's

24  response that, under *Mitchell* -- under *United States v.*

25  *Mitchell*, a defendant is not entitled to a jury of any

1  particular composition, and since you're not entitled to a jury

2  of any particular composition, this requested information would

3  not relate to a plausible motion to dismiss, or challenge, and

4  so for that reason, the Court should deny the request?

5          MR. GRIFFIN:  And I think that that -- that *Mitchell*,

6  I think, is more tailored to, because Dr. Staley is a white,

7  you know, certain demographic that, therefore, he's entitled to

8  a specific composition based upon his specific characteristics,

9  and that's not what we're doing here.  Right?  We're asking

10  just to make sure that, pursuant to his Sixth Amendment, that

11  there's a fair cross-section.  So I think that that

12  particular --

13          THE COURT:  So *Mitchell* is not a fair cross-section

14  case?

15          MR. GRIFFIN:  Right.  And I don't believe -- and

16  again, I know that this is -- the government's cited this -- my

17  recollection of -- I reviewed this -- was that it's -- the

18  issue there is the particular cross-section, saying that, let's

19  start -- that there's no requirement that we start matching

20  grand juries to specific particular cases or particular

21  potential compositions.

22          So I think that's -- I think that's more about

23  spelling out --

24          Is the Court following what I'm saying there as far

25  as --

1          THE COURT:  I think so, but let me hear from the

2     government.

3          MS. STAHL:  Thank you, Your Honor.

4          I think we've gotten a little bit mixed up here.  The

5     fair section -- the fair cross-section Sixth Amendment issue

6     has to do with the jury that's impaneled.

7          Here, this grand jury was impaneled in January of

8     2019.  COVID did not touch the impaneling process.

9          The fair section -- the fair cross-section argument

10    looks at the jury pool.  So we're at the 100, 150 -- all of

11    those people who were called in to be the initial veneer of the

12    grand jury, were those people a fair cross-section.  That has

13    to do with jury selection.

14         Once a grand jury is impaneled, the 16 to 23 members,

15    we don't look at the composition of those individuals for the

16    reason Your Honor has stated.  There might be absences on any

17    given day.  The fact that quorum can be met with less than the

18    23 proves that.

19         Further, the Supreme Court in *Thiel* stated it would be

20    impractical to require 20 percent of any given ethnicity or

21    religious or, you know, male versus female.  We can't require

22    that in the room at any given time, it's impractical.

23         So the Sixth Amendment cross-section issue does not

24    look at the individual composition of the 16 to 23 or the

25    individuals who actually returned the indictment.

 1        THE COURT:  You said that was the United States
 2  Supreme Court in the *Thiel* case.
 3        MS. STAHL:  *Thiel*, T-h-i-e-l.  Let me find the
 4  citation.  I apologize, Your Honor.
 5        THE COURT:  That's all right.
 6        (Pause in the proceedings)
 7        MS. STAHL:  It is 328 U.S. 217.
 8        THE COURT:  328 U.S. 217.
 9        MS. STAHL:  Correct, Your Honor.
10        THE COURT:  Thank you.
11        MS. STAHL:  And that case was discussed in the line of
12  cases dealing directly out of this jurisdiction.
13        So in this jurisdiction, the Federal Defenders have
14  challenged the fair cross-section of our jury pool at least 3
15  times in the recent past; that was *Torres-Hernandez*, *Arturo*,
16  and *Escovel*, all cited in our briefing.
17        Each of those cases, the Federal Defenders were
18  stating that the jury wheel, the initial veneers, were not fair
19  cross-sections, and the Ninth Circuit said that they were.
20  Those cases were about the veneer.
21        Again, here, if there was any difference in who showed
22  up on May 20th, that didn't have anything to do with the
23  veneer, that was already the jury panel that was selected.
24        And just to clarify the record on one point.  I
25  believe -- I don't know the exact number, but there were over

1   20 indictments returned on May 20th, and there were at least, I

2   believe, 20 on each subsequent day that the grand jury met.

3          Because there had been an absence of the grand jury

4   for so long, so many cases had to be indicted, and these

5   included, not only proactive cases, but border busts, alien

6   smuggling, illegal immigration cases.  So those numbers were

7   great.  This case was not singled out for indictment on

8   May 20th.

9          THE COURT:  So May 20th was the date when the

10  government went back to the grand jury and began requesting the

11  return of indictments?

12         MS. STAHL:  That was the first day that the Chief

13  Judge had ordered the grand jury to return, yes, Your Honor.

14         THE COURT:  All right.

15         MR. GRIFFIN:  And, Your Honor --

16         THE COURT:  Yes.

17         MR. GRIFFIN:  -- that actually gives rise to

18  something.  Right?  I think it's the perfect example of what we

19  don't know, we can't argue.

20         So based upon the representation from the government

21  that there may be some situation where there was some

22  incredible rush down here, if there was a mass sprint to get a

23  whole bunch of different indictments issued in a very short

24  amount of time, there could have been steps missed.

25         So that is precisely the type of flaw to the grand

1  jury that we wouldn't know, and then so I think that if there

2  was any sort of evidence of that, and that this was essentially

3  a rubber stamping grand jury that was just pushing through

4  indictments to get them all done because of a backlog, I think

5  that that could be extremely relevant to a challenge, Your

6  Honor.

7          THE COURT:  I've heard you on a number of occasions

8  say that -- you used the word "could".  That what we have is

9  COVID-19 could have influenced the grand jury.  That because of

10  the press of business, that could have impacted the

11  presentation.

12         There's a lot of could's, but when you look at what is

13  backing up the could, it doesn't strike me that there is a lot

14  of heft there.  That there's a lot there, there.

15         And at this point, without more, I'm not prepared to

16  direct the government to turn over the requested information in

17  Request No. 7.

18         And so with that, we'll turn to the next case-specific

19  set of requests, and that is as to COVID-19-specific requests.

20         And as to those, we begin with, "Medical or public

21  health experts consulted prior to charging."  And the basis for

22  this is the assertion that this information is relevant to a

23  motion to dismiss the indictment, and I'm having trouble

24  wrapping my head around that proposition.

25         To the extent that the government ended up consulting

1  with Dr. Jones, and your followup to learn is that Dr. Jones

2  was from a different school of thought with respect to the

3  efficacy of antimalarial drugs, how does that move the ball up

4  the field as far as a motion to dismiss?

5          MR. GRIFFIN:  Thank you, Your Honor.

6          So there's really -- we articulate a potential motion

7  to dismiss, but I'd like to supplement that here, as well as,

8  it could be potentially relevant later on at trial just for,

9  essentially, some lack of investigation.

10          And what we're getting at here, Your Honor, it's not a

11  battle about the efficacy of the medications, it's, as I lay

12  out in my response, that either before weighing in on medical

13  decisions, the government essentially conducted a Google search

14  to determine what the appropriate medical procedures or

15  opinions are with respect to this, or they consulted an expert.

16          And what we're getting at here is a pattern and

17  practice, potentially.  And I think it's important, Your Honor,

18  to zoom out of this case.  Because what's happening here is, is

19  that we have the Executive Branch created mass chaos and

20  confusion in the space because of their statements regarding

21  these medications.  While the FDA is doing one thing, the Chief

22  Executive is doing another.

23          And because of all of this chaos -- and unfortunately,

24  this has become a political issue -- a -- there is 30,

25  40 percent of the country thinks one thing, the other thinks

1    different.  And this is -- this is the times we live in.

2          But given the nature of this case, given its political

3    nature, given what we've seen with treating other entities and

4    businesses and physicians, and I think that it does give rise

5    to a potential motion to dismiss because of outrageous

6    government conduct.  And again, this would go more towards a

7    pattern and practice.

8          And we have already uncovered some misconduct on

9    behalf of the government.  And if we -- if it turns out that,

10   for some reason, Dr. Staley was singled out to make an example

11   of because of some disagreements internally or some political

12   disagreements, that is exactly the type of motion that we would

13   bring based upon that.

14         And again, we've already uncovered some government

15   misconduct in this case.

16         THE COURT:  Certainly, no one can dispute that the

17   Executive has created mass confusion.  No one can dispute that.

18   On any given day of the week you have different positions being

19   offered by the CDC, by the White House, you have talking heads

20   who are pretending to be doctors.  And we live in polarized

21   times.  No one can dispute that's the backdrop.

22         At the same time, the charges here aren't, in some

23   ways, particularly complicated, complex, difficult.  It's a

24   question of, was your client lying when he was describing these

25   antimalarial drugs as being these cure-alls or being able to do

42

1    what he represented that they could do.

2            And that's what it comes down to.  And that will be

3    the government's burden at trial, to prove that he lied, that

4    he knew that what he was reporting was a lie, and then you will

5    come back in your case and have your client, I think, or

6    perhaps -- testify as to why he said what he did, and why --

7    what he relied upon, and perhaps he relied upon the President

8    of the United States and his comments, and perhaps he relied

9    upon talking heads.  I don't know.

10           But it will be pretty much confined to those issues,

11   rather than seeking to bring in every nonstarter statement or

12   study that proved that antimalarials are effective, aren't

13   effective.

14           And I'm not going to allow this case to be the place

15   where all of these different disputes are litigated, because

16   that's not what the case is about.  The case is whether or not

17   your client lied and whether or not he did so knowingly.

18           And so with respect to whether or not the government

19   consulted with a health expert and identifying and disclosing

20   what medical experts were consulted, I've never seen a case

21   that stands for the proposition that that is somehow or another

22   Brady, or otherwise Rule 16, unless it comports with one of the

23   requirements that that is -- that scientific tests were

24   performed by these individuals and that they relate to the

25   charges.

1          But at this point, I do not find that this information

2     is discoverable, and that it does not lend itself to a motion

3     to dismiss or for the adequate preparation at trial.

4          Certainly, the government is going to depend or rely

5     upon some medical doctor or someone who is going to testify as

6     to these antimalarials, and someone who is going to be prepared

7     to testify that what was represented by Dr. Staley was a lie.

8     They're going to have to have someone do that.

9          And they're going to identify that person and the

10    basis for his opinions 6 weeks before trial.  And at that

11    point, you will be in the position of knowing who it is, what

12    the basis is for that expert's opinions, and to the extent that

13    what he has to say is inadequately supported, you will have

14    your way with him in terms of cross examining them at trial.

15         But that's how this particular issue will be litigated

16    rather than going back 6 months before and whether or not, you

17    know, the government consulted with different doctors or

18    researched different information.

19         So that's how the Court is going to have this matter

20    play out with respect to experts.

21         MR. GRIFFIN:  Maybe I wasn't exactly clear, Your

22    Honor.

23         The reason why we're asking for this is not to learn

24    about whether or not the government, you know, is dealing with

25    the -- how well this medication works or doesn't work, it's

1   more about the predicate for this investigation and if there

2   was a pattern and practice that rises to the level of

3   misconduct.

4           The reason --

5           THE COURT:  What do you mean by that, "pattern and

6   practice"?

7           MR. GRIFFIN:  Well, essentially, this, Your Honor.

8   And this kind of dovetails with another request we're making

9   with COVID fraud declination letters, and I'll bring that in

10  here because it helps what I'm getting at.

11          So in the public space, we had this:  That there -- we

12  know for certain, because of different letters, that there are

13  a handful of people, handful of organizations in this country

14  that are advertising cures for COVID -- right? -- holding out

15  to the public saying, "We have this," and in their marketing

16  materials, "It will cure you."

17          Those individuals got warning letters from the FTC.

18  And in this case, the only predicate for the investigation was

19  a newsletter that Dr. Staley sent out.  That newsletter made no

20  representations about a cure, it didn't say, "Buy this and

21  you'll be all good," to the effect it doesn't get into any of

22  that.

23          Based upon that newsletter, and based upon a couple

24  citizen complaints about that newsletter, and nothing more, the

25  FBI in this case sent in an undercover agent to then engage

1   with Dr. Staley.

2          There's been no evidence of any patients that feel

3   defrauded, there's no actual patients that were ever told that

4   this was a cure.

5          But for whatever reason, the FBI decided that

6   Dr. Staley, a gentleman with no criminal convictions and a war

7   veteran, he deserved an undercover FBI agent.

8          Now, that practice of saying, okay, we're going to

9   target Dr. Staley, now -- and they have continued with that

10  with some other conduct in the case that gives rise to the --

11  and again, this is not the time to litigate this motion -- the

12  burden that we have to clear is extremely low; will this be

13  helpful?

14         And it would be extremely helpful to a motion to

15  dismiss if we take the pattern in this case of sending in an

16  undercover FBI agent, not sending him an FTC letter, and then

17  working Dr. Staley and -- to extract some information.

18         Now -- and then it moves forward with that.  And if

19  we -- and we believe we have evidence that the FBI is taking

20  steps and actions in this case that give rise to, potentially,

21  a selective enforcement motion, outrageous government conduct

22  motion.

23         And again, with the purposes of discovery, we're not

24  asking to rule on the merits of this motion, Your Honor, only

25  that we be entitled to review this information so then we can

1    then decide what to do.

2            And again, there's some cases that spell out real

3    clearly, is sometimes just knowing what not to pursue counts as

4    helpful.

5            And again, the materiality issue is very

6    straightforward, and this is not the grand jury situation, Your

7    Honor.

8            THE COURT:  But again, what you are asking for is

9    something that falls, at least at the starting point, outside

10   of Rule 16 because it relates to a specific discovery request

11   that relates to a specific claim, and that is a selective

12   prosecution claim.

13           And one of the cases that the government relies upon

14   is *United States v. Hare*, 820 F.3d 93, where the Court observed

15   that the standard for obtaining discovery in support of a

16   selective prosecution claim is only slightly lower than proving

17   the claim itself.

18           So it doesn't sound like we have the same standard

19   being applied in these types of cases as you otherwise may for

20   a standard discovery request.

21           MR. GRIFFIN:  Right.  And this is actually not.  I

22   think the confusion in the government's brief, and we bring it

23   up is, is the difference between a selective prosecution claim

24   and a selective enforcement claim, and they're completely

25   different.  With respect, especially, with discovery, and

1   there's a *Sellers* case that is on point with this.

2          But again, what we're looking for with this, Your

3   Honor, is --

4          THE COURT:  So what case did you rely upon with

5   respect to seeking this under the selective enforcement?

6          MR. GRIFFIN:  It's *Sellers*, and let me get the cite.

7   I know --

8          MR. PILCHAK:  It's 906 F.3d 848.

9          MR. GRIFFIN:  And I'll read from is this, Your Honor.

10         The Court, therefore, specifically held, "Obtaining

11  discovery on a selective enforcement claim does not require

12  some evidence tending to show the existence of both essential

13  elements of the offense, discriminatory effect, and

14  discriminatory intent.  Notwithstanding that, the defendant

15  will eventually need to show those elements, but with respect

16  to discovery" -- and that's not the only hook that we're

17  hanging our hat with this, Your Honor.

18         THE COURT:  In *Sellers*, what was the discovery that

19  was being sought?

20         MR. GRIFFIN:  This was a -- I believe --

21         THE COURT:  Is that the D.C. Circuit case?

22         MR. PILCHAK:  No, Your Honor, it's from our circuit.

23  It was a stash house sting case where the panel had, sort of, a

24  palpable dislike for that law enforcement technique and said,

25  "We're going to roll back the traditional showing that's

1   required for" -- up to that point I think it was fair to read

2   the case law as both selective prosecution and selective

3   enforcement claims under *United States v. Armstrong*, which is

4   cited in our briefing.

5           And in the *Sellers* case, the Ninth Circuit said, in

6   these stash house reverse sting cases, there's going to be a

7   less rigorous standard of discovery.

8           In my reading, it's an open question after *Sellers*

9   whether that's just reversed stash house sting cases, but we

10  assume, for the purposes of our argument, that it would apply

11  in selective enforcement claim, and I think there's still a

12  fatal flaw with any selective enforcement claim in this case,

13  which is that, at least to this point, Mr. Griffin hasn't even

14  articulated a colorable basis for any discrimination for

15  selective enforcement in this case.  There's been no showing of

16  any equal protection classification, any exercise of a

17  constitutional right for which Mr. -- Dr. Staley -- I

18  apologize -- is being supposedly punished.

19          And without anything like that, it's obvious that

20  there can't be a selective enforcement claim in this case, so

21  even a lower bar after *Sellers* can't be met by the defense for

22  discovery on this case.

23          THE COURT:  Response?

24          MR. GRIFFIN:  Yes, Your Honor.  And I believe the

25  government is conflating the prosecution rigorous criteria to

1    prevail on that.  And I think the theme throughout the

2    government's position is to litigate the motions that we want

3    to file here right now, without us having the ability to have

4    the facts to actually file those.  And this is why we cited --

5              THE COURT:  So let me ask.  What do you have with

6    respect to your client being the victim of a selective

7    enforcement?

8              I know you identified some church groups who were

9    involved in trying to pass off certain substances as cure-alls

10   for COVID-19.  But do you have a set of cases involving doctors

11   where doctors were allegedly involved in trying to sell these

12   antimalarials as COVID miracle cures and there was declinations

13   in those cases?

14             MR. GRIFFIN:  Yes, Your Honor.  And again, I don't

15   want to tether this issue to only selective enforcement because

16   I think, again, it's relevant to a motion to dismiss for

17   potentially outrage government conduct.  So I want to be clear

18   that we're not just picking that lane.  This is a multiple

19   prong approach we can have.

20             And with respect to that, we are aware of several

21   letters.  Right?  Essentially, FTC letters, where there are

22   different businesses advertising cures, various different

23   cures --

24             THE COURT:  Again, these are doctors, or these are

25   just businesses?

1          MR. GRIFFIN:  There's one doctor.  There is -- and

2   again, we don't have the full body of all this, it's just from

3   open access internet searches on trying to track down FTC

4   letters -- but what we have are a group of people, and not just

5   that, we have --

6          THE COURT:  So to the extent that the FTC was sending

7   letters, does that show a declination by the United States

8   Attorney's Office?

9          MR. GRIFFIN:  I mean, I guess it doesn't preclude

10  them, of course, from later prosecuting, and if that happened,

11  obviously, in the genesis situation, as we were informed via

12  the responsive pleadings from the government that they actually

13  did get charged.

14         But to me, where this potentially could fit, Your

15  Honor, is, again, with selective enforcement, it's not

16  necessarily a protected class.  That's not how these motions

17  would proceed.

18         But with this, it could be an issue is geography.  All

19  right?  So here -- and again, this is where we need to zoom out

20  a little bit and be aware of what's going on in the United

21  States of America -- is that we live in a very liberal state.

22  We live in the Southern District of California.  And if there

23  is some sort of indication we can get that people were very

24  uncomfortable with what the Chief Executive was doing, and very

25  uncomfortable with the different information, and the different

 1   doctors, and the treatment of various other people in other

 2   jurisdictions, that potentially some decision was made to drop

 3   the hammer on somebody in the liberal bastion of Southern

 4   California.

 5              MR. PILCHAK:  Your Honor --

 6              MR. GRIFFIN:  That --

 7              MR. PILCHAK:  I'm sorry.  I didn't mean to interrupt

 8   Mr. Griffin --

 9              THE COURT:  But you did.

10              MR. PILCHAK:  -- I just want a chance to respond to

11   this.  I apologize, Your Honor.

12              MR. GRIFFIN:  So, and again, we are not -- we are

13   right now in this process.  Our data points for making

14   potential request to this is that we know that Dr. Staley got

15   an undercover FBI when others didn't.  All right?  That's a

16   fact we have.  And the threshold we make is, according to

17   *Sellers*, is have something more than mere speculation.

18              Our something that's more than mere speculation is we

19   know for certain that Dr. Staley, based only on an email

20   newsletter, received an undercover FBI agent when others did

21   not.  So that, therefore, rises over the mere speculation with

22   respect to the discovery request.

23              THE COURT:  And do you present this argument in your

24   papers, either your original papers or your responsive?

25              MR. GRIFFIN:  Your Honor, I know in prepping for this

 1    hearing, I -- you know, I really appreciate, I guess, the

 2    difference between the selective enforcement and prosecution,

 3    and --

 4            THE COURT:  All right.  I don't see it.  And at this

 5    point, I know that the government focused more on selective

 6    prosecution.

 7            I will allow the parties to further brief this precise

 8    issue on selective enforcement and whether or not *Sellers* would

 9    support the argument that's being made today.

10            So we will have a further status hearing and --

11            MR. PILCHAK:  Your Honor, may I respond to one of

12    the --

13            THE COURT:  Yes.  I'm sorry.

14            MR. PILCHAK:  Thank you.

15            While Mr. Griffin was arguing, I heard from the

16    defense several times that there are these inchoate allegations

17    of outrageous government misconduct that are percolating on

18    this case, and he returned to that theme, I don't know, 3 or 4

19    times.

20            And while I appreciate the defense's, you know, desire

21    to zoom out on this case and take the focus off of Dr. Staley's

22    conduct and place it somewhere, anywhere else in the Executive

23    Branch of the United States Government, I personally would

24    appreciate, if the Court would consider inquiring, as to what

25    the government misconduct that's been identified to date is.

1    I'm not inviting anyone to engage in a full litigation

2    of some motions that may or may not be filed later, but as the

3    Court knows, the government takes those allegations very

4    seriously.  We do not aim to commit any flavors of misconduct,

5    let alone outrageous.  And I would appreciate, if the defense

6    believes it's identified a pattern of such conduct in this

7    case, if it would consider sharing that with us.

8            MR. GRIFFIN:  Gladly.  Thank you, Your Honor.

9            So this case, Your Honor, we have a couple of agents

10   that are -- overzealous, I don't even think, begins to cover

11   it.  And the prime example is this:  Is that when this case

12   originated, the government was aware, was presented evidence

13   that the medications that Dr. Staley was selling were not

14   counterfeit.

15           The government made an erroneous determination, that I

16   determined was wrong with a five-minute Google search, where

17   they believed that the medications that came in and that were

18   ultimately delivered to patients were counterfeit.

19           They were sent -- again, it took 5 minutes on Google

20   to pull up a pill ID to show that that was not true.

21           Notwithstanding this, these FBI agents are going to

22   Dr. Staley's patients, and they are telling them, "You were

23   sold counterfeit drugs."  And this has happened again, and the

24   FBI and the FDA in this situation does -- does not do a great

25   job of writing down in their reports what they tell witnesses.

1    They're generally writing down what witnesses tell them.

2          But even in their own reports they include this.  So

3    now these are witnesses, these are real patients that had real

4    interactions with Dr. Staley.  They now have been sitting there

5    for 3, 4, 5 months believing that Dr. Staley was selling them

6    counterfeit drugs during a pandemic, therefore poisoning

7    whatever opinions they have of Dr. Staley, tainting their

8    testimony at trial.

9          So this type of behavior, this aggressive need to do

10   what they can to poison the welfare of Dr. Staley, they're

11   doing it with witnesses, and they did it originally, just their

12   behavior with why Dr. Staley got the FBI investigation to begin

13   with.

14         This is the pattern we speak to, Your Honor.  And

15   again, we are at a disadvantage because these aren't recorded

16   interactions.  Some of the witnesses that my investigator has

17   tried to talk to, Your Honor, won't even speak to him because

18   they are so furious.  These are witnesses that originally had

19   no problem talking to the defense, but now that they have been

20   approached, after being misinformed by the federal government

21   about what they were sold, will not even speak to the defense.

22         Therefore, they're undercutting our entire ability to

23   put a defense on in this case.  So this is the type of

24   behavior, Your Honor, that we have far more than just a simple

25   mere speculation, we have hardcore evidence, and it's extremely

1   important to the case, Your Honor.

2        THE COURT:  So I guess that responds to your question.

3   But at the same time, given that it appears that the government

4   is basing their theory of liability or criminality based upon

5   what your client represented, rather than what other people may

6   have been told, is the government looking at calling some of

7   these people that is otherwise referred to by Mr. Griffin at

8   trial regarding the intent to make false statements or the

9   falsity of those statements?

10        MR. PILCHAK:  We haven't made a final determination

11   about that, Your Honor.  I can tell you, and the Court

12   obviously appreciates, the way the charges are framed now,

13   centered directly on Dr. Staley's statements to the undercover

14   FBI agent, which is the one example of a complete set of

15   recorded interactions between the doctor and someone that he

16   believed was a patient.

17        MR. GRIFFIN:  And why this matters so much, Your

18   Honor, is the sole issue at this trial, really, going to be

19   intent.  How are we going to crawl into Dr. Staley's brain and

20   figure out whether or not he intended to defraud.

21        Well, one way that intent is generally proved or not

22   proved is look at the big picture.  What did he do?

23        Dr. Staley had 40 different interactions with real

24   patients.  Not a single one of those patients was told that

25   there's a cure or made any promises.  So the fact that that is

1   his approach with this, and that the one exception -- someone

2   may say, well, why the FBI agent?  There lies the defense.  The

3   fact that the only person that heard this happens to be a

4   trained undercover FBI agent with a specific goal in mind, and

5   then everybody else was just a normal patient.

6           So if Dr. Staley was perpetrating a fraud, that

7   somebody else would have been defrauded.  And the fact that we

8   had a group of witnesses that were favorable, that we would

9   call these witnesses, because intent is the issue, and now

10  we're potentially unable to even do that because -- because of

11  what's gone on with their interactions with the federal

12  government.

13          THE COURT:  I don't want to get too far ahead of

14  myself given that, at this point, we don't have a motion to

15  dismiss based upon government outrageous misconduct, and your

16  query was focused more on, kind of, getting a sense of what the

17  government misconduct was, at this point it sounds like you

18  have that, and then we'll wait and see whether or not these

19  accusations find their way into a motion to dismiss.

20          MR. PILCHAK:  Yes, Your Honor.  Thank you.

21          The only thing I would note for the record for today's

22  purposes, because I think we're getting a bit ahead of

23  ourselves, is that the government's statements to the Court

24  about counterfeit -- belief that the medicine in this case

25  could have been counterfeit were based on communications from

1  drug company representatives, I believe that have been turned

2  over in discovery, so we weren't making these things up off the

3  top of our head.  But I also can't say that with firsthand

4  knowledge because that was before I came on the case.

5         THE COURT:  All right.

6         MR. GRIFFIN:  And perhaps the Court can inquire around

7  this narrow topic is that, given the government also made these

8  statements that turned out not to be true in a bail hearing,

9  and they had to correct that on the record, I don't know if

10 there's been any attempt to correct the record with all of

11 these witnesses, but I think if the Court is required to have

12 that type of misstatement or incorrect statement corrected,

13 whether or not all these different witnesses who were told that

14 have also received that same correction.

15        THE COURT:  Yeah.  You know what?  I'll let you all

16 meet and confer on this.  I'm getting involved in something

17 that isn't concrete, that isn't sufficiently solid for me to

18 become involved.

19        So that's what we're going to do as to the filed

20 investigation declinations request.  We'll have further

21 briefing on it.  I'll allow Mr. Griffin to file additional

22 papers on that.

23        How long do you need?  2, 3 weeks?

24        MR. GRIFFIN:  Yeah.  3 weeks, I think, would be

25 sufficient, Your Honor.

1          THE COURT:  All right.  And then I'll give the

2   government --

3          So that will be the 26th of August.  And then the

4   government can respond by September 9th.  And then we'll set

5   our next status conference for September 16th.

6          Is that available for everybody?

7          MR. GRIFFIN:  Yes.

8          THE COURT:  It's a Wednesday.  Do we have 2:00 p.m.

9   available?

10          THE CLERK:  Yes.

11          MR. GRIFFIN:  That's good for the defense, Your Honor.

12          MR. PILCHAK:  And good for the government, as well,

13   Your Honor.

14          THE COURT:  September 16th at 2:00 p.m.

15          And just so I don't forget, Dr. Staley, you are

16   ordered to return to this courtroom on September 16 at

17   2:00 p.m.  Do you understand?

18          THE DEFENDANT:  Yes, Your Honor.

19          THE COURT:  All right.  So then, moving on to the next

20   request, the hydroxychloroquine and chloroquine procurement by

21   the Department of Justice.

22          How does that relate to an available defense, a

23   possible defense, or a possible pretrial motion to dismiss the

24   indictment?

25          MR. GRIFFIN:  Yes, Your Honor.

 1            So with respect to these -- the procurement.  So in

 2    the indictment, there's some factual statements made by the

 3    government pertaining to hydroxychloroquine.  And it's relevant

 4    for 2, really, areas, and these are more defenses.

 5            And again, I really want to stress, these don't have

 6    to be successful defenses, this is just may be helpful to us,

 7    and how does may be helpful to the defense is again potentially

 8    even abandoning a certain theory.

 9            And there's case law in this, Your Honor.  The

10    *Hernandez* -- the *Hernandez-Mesa* case, which is cited throughout

11    my brief -- my briefing is helpful -- can even be informing

12    defense on what not to pursue.  So --

13            THE COURT:  So what defense would this be helpful in

14    informing you not to pursue?

15            MR. GRIFFIN:  Sorry, Your Honor.  I was trying to lay

16    a foundation, because I believe we're getting a little far

17    afield from, just, the discovery.  You know?  Having to

18    actually argue the motions on merits.

19            But why we find this to be so relevant and so

20    important is there's specific statements made by the government

21    pertaining to hydroxychloroquine and whether or not it's a

22    dangerous drug or how it's administered.  And I believe that

23    there potentially could be inferences made about its -- how

24    effective it is or not.

25            And with respect to -- there's also, potentially, an

1   issue about procurement, about Dr. Staley's procurement in

2   this.  And it would be relevant to explain why Dr. Staley had

3   to take certain actions to procure, or to attempt to procure,

4   these medications, one of which is because the government

5   grabbed it all.

6        And not -- and more specifically is the Department of

7   Justice is prosecuting this case.  And there, to me, is a

8   hypocrisy that's baked into this.  That it's -- that it's

9   treating these medications as -- as something that has no place

10  in medicine and that has no place in the treatment of COVID,

11  and at the same, exact time, the Department of Justice is

12  purchasing these medications in bulk.

13       So this could be relevant to cross examination, could

14  be bias of witnesses, there's a lot of different reasons how --

15  and again, relevancy isn't the standard that we need to meet,

16  but how it could play into it is really just informing us

17  about -- you know, perhaps we get an email that's turned over

18  that talks about, you know, somebody in the government making

19  assessments on it being a cure or various other issues.

20       But just the fact that, you know, we're going off of

21  just media reports.  And according to a couple different cases,

22  Your Honor, there's a *U.S. v. Stever*, S-t-e-v-e-r, 603 F.3d 747

23  is -- there's -- media reports can give us this foundation to

24  say, hey, we believe this exists, we believe that it's there,

25  and we've cited those media reports.  But, you know, media

 1   reports are not enough to cross examine somebody, and what

 2   we're asking for is evidence of -- and this is -- we narrowed

 3   it to the Department of Justice for a reason.  We're not asking

 4   for all of the federal government.

 5            And again, it's relevant for two specific areas, is

 6   one, to rebut any sort of claims and to cast doubt on any sort

 7   of issues that the Department of Justice may make towards

 8   hydroxychloroquine, and then B, to also show evidence of why

 9   Dr. Staley had to take some more unorthodox procedural steps to

10   procure it himself.

11            THE COURT:  It seems to me that the focus of the

12   government's case is on what your client said, what he knew,

13   and what he intended.

14            And so this effort to open this up to the world and

15   what the world knew, what the world has said, what the world

16   understands will confuse the issues at trial, it will

17   unnecessarily expand the focus of the jury to matters that will

18   confuse them, and so --

19            Let me hear from the government.

20            MR. PILCHAK:  Your Honor, I agree with the Court.  I

21   think the characterization from the defense is a classic

22   statement of a fishing expedition.

23            To return to something the Court said earlier, the

24   defense is hypothesizing.  Maybe there are emails somewhere in

25   the bowels of the Department of Justice that could say things,

1    that could paint the Department in a bad light or complicate

2    the question of was hydroxychloroquine an effective medicine.

3          But I also think I heard the defense say, unless I

4    misheard, a few minutes ago that this is not a battle about the

5    efficacy of the medicine.  This case is not about that.  It's

6    not charged as a medical malpractice case because that's not a

7    crime, it's charged here as a fraud case, and I think, as the

8    Court recognizes, this issue is very far afield from that.  So

9    far afield that it's not a discoverable issue.

10          THE COURT:  Well, and initially, I was prepared to ask

11   the question, given the fact that it has been, it appears,

12   publicized that the Department of Justice procured

13   hydroxychloroquine and chloroquine, and perhaps other parts of

14   the government did so, as well, why isn't that sufficient to

15   inform the defense with respect to the actions of the

16   Department of Justice?

17          But then I heard you say that you were actually

18   looking for emails regarding assessments of efficacy or

19   assessments regarding these substances, and so then that would

20   then require the government to make a request, or require the

21   Court to order Main Justice to identify any emails that related

22   to the procurement of any hydroxychloroquine.

23          And I expect that there's probably more than a couple,

24   and that there's going to be the need to have government

25   employees produce hundreds or thousands of emails on something

1   where, at the end of the day, I don't see how it fits in at

2   trial.

3        And so, again, based upon this idea that the charges

4   here focus on what your client did, what he said, what you

5   knew, what he intended.  So to the extent that what he knew and

6   what he intended was based upon what he heard about the

7   Department of Justice, then that's fine.  He can testify about

8   that.

9        But with respect to independently showing that, well,

10  on April the 4th, the Department made a purchase of this amount

11  of hydroxychloroquine, and in that one fell swoop, it was no

12  longer available to medical practitioners such as Dr. Staley,

13  and so we're entitled to bring that into evidence at the trial,

14  I don't see how that is proper.

15       MR. GRIFFIN:  And I believe where it's proper, Your

16  Honor, is that the government has indicated that they were

17  going to be having an expert witness in this case.  Cross

18  examining an expert witness, for instance, we have an exact

19  situation where that would come in.

20       The expert witness will likely get on the witness

21  stand and talk about various different issues relating to these

22  medications -- and that would be, in our opinion, based upon

23  news reports -- will be a departure from what the Department of

24  Justice has done in action.  Okay?  So that could be a whole

25  line of questions on cross.

1    And again, this is -- for the purpose of discovery,

2    that could be helpful.  And the helpful is extremely low

3    burden.

4    And so having that information, whether we get to use

5    it in court, ultimately, is a whole nother decision that's not

6    before the Court today, whether or not it's admissible, but for

7    the purposes of discovery, allowing the defense to understand

8    what's going on with that.

9    Because I think any reasonable observer can kind of

10   wonder about that, how can an indictment, the same organization

11   that's indicting, say that this is -- that this is dangerous

12   and this is -- be very, very careful of this, and then at the

13   same, exact time, be purchasing mass quantities.

14   So those are the type of issues, Your Honor, that --

15   And again, this is why we think it could be useful to

16   this cross examination.

17   This also could then, again, dovetail with potential

18   motions that we need to bring with respect to motions to

19   dismiss, Your Honor.

20   MR. PILCHAK:  And Your Honor, I just want to clarify.

21   I don't think the United States is committed to calling an

22   expert at trial.  I think the Court opined, very sensibly, that

23   it would make sense to call an expert at this trial, but the

24   United States is still formulating its trial strategy in this

25   case.

1              MR. GRIFFIN:  And Your Honor, I know I cite a bunch a

2    cases in here, but the Circuit Courts are very liberal when

3    construing stuff that can be used for these type of cross

4    examination issues.  There's a bunch of law and training

5    materials and various other issues with that.

6              And I really do think that this type of, I guess,

7    hypocrisy within the government is something I think can be

8    explored.  And again, whether or not Your Honor ultimately lets

9    it in, I think that -- but I think that we would be entitled to

10   at least receive it, and then that's a fight for another day.

11             THE COURT:  Well, certainly, this case is sui generis

12   by itself in terms of the issues that it presents.

13             And given that this case is about whether or not

14   Dr. Staley lied when he described these medicines as a magic

15   bullet, almost too good to believe, cured the disease, and

16   where one ends up with a component of the United States

17   Government, the Department of Justice, making certain purchases

18   that would, in some way, provide support for the notion that

19   these antimalarial drugs are effective in, if not curing, in

20   treating COVID-19, that suddenly, you have the prospect of a

21   defendant relying upon what the Government of the United States

22   has said on a topic to support his, if not thinking, his

23   rationale for making the statements that he made.

24             And so that's very unusual, and you will probably

25   never, ever, ever find that kind of scenario replayed.

1          And I'm not prepared to order the government to turn

2    over all information about DOJ's purchase of hydroxychloroquine

3    because, in the Court's view, it's not warranted.

4          At the same time, there is some aspect of this that

5    may, at some point or in a more circumscribed manner, justify

6    additional discovery, but at this point, I'm not there yet.

7          And this also goes to Request No. -- I think it's 6,

8    Department of Justice guidance.  I don't know if there are any

9    DOJ orders, policy memos and guidance pertaining to

10   hydroxychloroquine.

11         I'll direct the government to inquire, and to the

12   extent that there is, to provide these materials in-camera.

13         With respect to the request for undercover FBI agent

14   interview training manuals, at this point, I don't find any

15   basis for having those materials provided as discovery.

16         And as to the Department of Justice interactions with

17   media, it appears that the government indicated that they were

18   prepared to provide something in response to that?

19         MR. PILCHAK:  Yes, Your Honor.  I think there was a

20   miscommunication somehow between the parties, or perhaps just a

21   misimpression on the part of the defense, that this case was

22   initiated because FBI talked with reporters or members of the

23   media.

24         That's not my impression.  I represented that to the

25   defense.  And in our papers, we explain the investigation was

1    initiated by citizen complaints, and we've turned over one of

2    those complaints to the defense.

3              THE COURT:  All right.

4              MR. GRIFFIN:  And Your Honor, if I could just revisit

5    one narrow issue here with respect to the -- with the

6    procurement.

7              Potentially, and given the Court's ruling, if I could

8    narrow that because, as opposed to all -- and I think perhaps

9    the Court was concerned with the email comment -- but just --

10   perhaps just the fact that it was procured.  Right?  Because

11   what we're going off of are media reports.  And I think a very

12   narrow request of whether -- it could be a one-page document

13   that just says yes, you know, that this actually did take

14   place, the media has gotten things wrong in the past, and I

15   think that that satisfies it.  And again, because --

16             THE COURT:  All right.  Let me inquire of the

17   government.

18             To the extent that that now has been limited to that

19   extent, is there an objection?

20             MR. PILCHAK:  Yes, Your Honor.  I think we'd maintain

21   our objection, first on relevance grounds.  Again, you know,

22   I'm not sure exactly what's at issue here.  I don't think the

23   defense is sure exactly what's at issue here either, which is

24   part of the problem.

25             But you can picture FBI agents from this case on the

1   stand testifying about what they did in this investigation and

2   what -- being cross examined with a procurement by the Bureau

3   of Prisons in Kansas that was totally unrelated to the facts of

4   this investigation.  I don't think that rises to the level of

5   discovery.

6         And I also think that the Court is entitled to

7   consider, especially at the margins with these discovery

8   requests that are so far outside the traditional heartland of

9   Rule 16 and Brady, that the Court's entitled to consider what

10   is the burden on the parties with producing this discovery.  In

11   this case, the burden on the United States.

12         And as we noted in Footnote 16 in our original

13   response to Dr. Staley's motion, the Department of Justice has

14   over 100,000 employees.  It has 36 different components.  One

15   of those components is the Executive Office of the U.S.

16   Attorney's which itself has -- and I always forget whether it's

17   93 or 94 -- different U.S. Attorney's Offices like my office.

18         And the Department of Justice doesn't have, as I've

19   come to understand it in looking into Dr. Staley's request, one

20   monolithic procurement authority that covers every car, every

21   paperclip, every computer that's purchased everywhere in the

22   Department of Justice.

23         THE COURT:  But we're not talking about a paperclip,

24   are we?

25         MR. PILCHAK:  No, Your Honor.

1      THE COURT:  It seems to me that it shouldn't be that

2  hard to confirm whether or not the Department of Justice

3  procured hydroxychloroquine, and, to the extent that the answer

4  is yes, then there will be perhaps a motion in limine to

5  exclude that at trial, and we can handle it in that manner.

6      But I'll ask the government to look into what would it

7  take to confirm this, and perhaps Mr. Griffin can provide the

8  government his sources or his clippings, the stories that he's

9  referring to as having given rise to this position.

10      MR. GRIFFIN:  Yes, Your Honor.  The link I cite in my

11  brief actually names the companies involved.  I think it would

12  be a pretty easy email of, hey, here's this transaction, this

13  date, this company.  I think that -- I don't think would be too

14  hard to track this down.  This isn't a needle-in-a-haystack

15  situation, Your Honor.

16      MR. PILCHAK:  Well, I'd like to be clear, though.  It

17  would be commensurately easier to find out if that one incident

18  happened.  I had understood the Court and the defense to be

19  talking about canvassing the entire Department of Justice.

20      THE COURT:  No.  And at this point --

21      MR. GRIFFIN:  I would narrow it.

22      THE COURT:  -- we're prepared to further limit it to

23  that one transaction, and then --

24      MR. PILCHAK:  I understand.

25      THE COURT:  -- if for some reason then you determine

1    that even to learn that you'd need an act of Congress and go

2    through 1,000 hoops and have to deal with any number of

3    individuals, and that this information is otherwise not

4    discoverable based upon some of the case law, then I'm prepared

5    to consider that.

6          But to the extent that it's not problematic and

7    otherwise then addresses this request, then at this point I

8    will direct the Court to -- the government to inquire.

9          So at this juncture, that addresses all of the

10   requests that have been made that are case-specific.

11         We have a hearing date that we have now scheduled for

12   September 16th for followup on the 3 matters that I asked the

13   government to follow up on.

14         And then the Court is prepared to find excludable time

15   between now and September 16 under 3161(h)(1)(D) based upon the

16   pending discovery motion and followup.

17         And then, is there anything else that either party

18   wants to bring to my attention?

19         MR. PILCHAK:  No, for the United States.

20         MR. GRIFFIN:  No, Your Honor.

21         THE COURT:  All right.  And then I previously have

22   directed Dr. Staley to return to this courtroom September 16 at

23   2:00 p.m.

24         That concludes this proceeding.  Have a good weekend.

25              (Proceedings conclude at 2:54 p.m.)

C E R T I F I C A T I O N

        I hereby certify that I am a duly appointed, qualified and acting official Court Reporter for the United States District Court; that the foregoing is a true and correct transcript of the proceedings had in the aforementioned cause; that said transcript is a true and correct transcription of my stenographic notes; and that the format used herein complies with rules and requirements of the United States Judicial Conference.

Dated:  August 13, 2020, at San Diego, California.


                        /s/ Ellen L. Simone
                        _____
                        Ellen L. Simone, RMR, CRR
                        Official Court Reporter