**FILED**

Dec 02 2020
4:48 pm

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY      s/ zenobiaa      DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

January 2019 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>    v.<br><br>JENNINGS RYAN STALEY,<br><br>            Defendant. | Case No. <u>20CR1227-GPC</u><br><br>I N D I C T M E N T<br>**(Superseding)**<br><br>Title 18, U.S.C., Sec. 1341 –<br>Mail Fraud; Title 18, U.S.C.,<br>Sec. 545 – Importation Contrary<br>to Law; Title 18, U.S.C.,<br>Sec. 1001(a)(2) – False Statement;<br>Title 18, U.S.C., Sec. 1028A –<br>Aggravated Identity Theft;<br>Title 18, U.S.C., Secs. 545,<br>981(a)(1)(C), and 982(a)(2)(B), and<br>Title 28, U.S.C., Sec. 2461(c) –<br>Criminal Forfeiture |

The grand jury charges, at all times material to this Superseding Indictment:

### Introductory Allegations

#### COVID-19, hydroxychloroquine, chloroquine, and mefloquine

1.    COVID-19 is an infectious disease caused by a newly-discovered coronavirus.  This new virus was unknown before the outbreak began in Wuhan, China, in December 2019.  The most common symptoms of COVID-19 are fever, tiredness, and dry cough, although some people who get COVID-19 become seriously ill and develop difficulty breathing, and some cases result in death.  On March 11, 2020, the World Health Organization (WHO) recognized the outbreak as a "pandemic."  As of April 5, 2020, the WHO reported over 1.1 million cases worldwide, with over 60,000 deaths.  At

NWP:nlv:JBST:San Diego:12/2/20

that point, the WHO web site stated, "At this time, there are no specific vaccines or treatments for COVID-19.  However, there are many ongoing clinical trials evaluating potential treatments."

2.  As of April 7, 2020, the Centers for Disease Control and Prevention (CDC) noted that there were "no drugs or other therapeutics approved by the U.S. Food and Drug Administration [FDA] to prevent or treat COVID-19."  The CDC noted that two "oral prescription drugs that have been used for treatment of malaria and certain inflammatory conditions," namely hydroxychloroquine and chloroquine, were "under investigation in clinical trials for pre-exposure or post-exposure prophylaxis of SARS-CoV-2 infection, and treatment of patients with mild, moderate, and severe COVID-19."

3.  By letter dated March 28, 2020, the FDA noted that "[c]hloroquine phosphate and hydroxychloroquine sulfate are not FDA-approved for treatment of COVID-19."  The FDA encouraged clinical trials to determine the effectiveness of these drugs in treating COVID-19.  However, the FDA determined that "[b]ased on the totality of scientific evidence available to FDA, it is reasonable to believe that chloroquine phosphate and hydroxychloroquine sulfate may be effective in treating COVID-19," and that circumstances warranted the emergency approval of the drugs.  Accordingly, the FDA authorized "the emergency use of chloroquine phosphate and hydroxychloroquine sulfate, . . . when clinical trials are not available, or participation is not feasible," subject to the specific terms of the authorization letter.  These terms included requirements that the medications be distributed from the Strategic National Stockpile to public health authorities, and that they "may only be used to treat adult and adolescent patients who weigh 50 kg [110 pounds] or more hospitalized with COVID-19 for whom a clinical

2

1 trial is not available, or participation is not feasible." In sum, as
2 of March 28, 2020, hydroxychloroquine and chloroquine were FDA approved
3 for use only to treat patients under strict conditions, namely patients
4 hospitalized with COVID-19 who could not participate in a clinical trial,
5 among other limitations.

6     4. Mefloquine was a drug approved by the FDA for use in treating
7 malaria. Like hydroxychloroquine and chloroquine, mefloquine was
8 available by prescription only.

9                                         **Skinny Beach Med Spa**

10     5. Skinny Beach Med Spa (Skinny Beach) was a business based in
11 San Diego, California that advertised services such as weight loss
12 programs, hyperbaric oxygen therapy, Botox, tattoo removal, hair
13 removal, and fat transfer. Skinny Beach was owned and operated by
14 defendant JENNINGS RYAN STALEY, a medical doctor who was licensed by the
15 State of California.

16                                    **Counts 1-3**
17                                **Mail Fraud**
                          **18 U.S.C. § 1341**

18     6. The foregoing paragraphs are hereby incorporated by reference
19 as if fully stated herein.

20     7. Beginning no later than March 27, 2020, and continuing up to
21 at least April 17, 2020, within the Southern District of California,
22 defendant JENNINGS RYAN STALEY (STALEY) knowingly and with the intent
23 to defraud, devised a material scheme and artifice to defraud, and to
24 obtain money and property by means of materially false and fraudulent
25 pretenses, representations, and promises.

26     8. It was the purpose of the scheme for STALEY to profit from the
27 COVID-19 pandemic by obtaining hydroxychloroquine, chloroquine, and
28 mefloquine "by any means necessary," including lying to U.S. Customs and

1  Border Protection to import bulk hydroxychloroquine powder from China
2  and generating sham prescriptions written without the knowledge or
3  consent of the listed patient, and then by selling those drugs to Skinny
4  Beach customers and others at a significant profit, including by means
5  of false and fraudulent claims that the drugs were guaranteed to cure
6  COVID-19.

7       9.   To execute the scheme, STALEY used the following manner and
8  means, among others:

9            a.   STALEY and Skinny Beach would solicit customers by
10 sending out mass emails and other messages, and via a dedicated website,
11 "covid19medkits.com," advertising COVID-19 treatments;

12           b.   STALEY would solicit others, including an associate and
13 an employee, for "extra" tablets of hydroxychloroquine, which he planned
14 to resell to customers and others as part of his COVID-19 treatment
15 kits;

16           c.   STALEY would write prescriptions, including sham
17 prescriptions, for hydroxychloroquine, chloroquine, and mefloquine, for
18 his immediate family members, associates, acquaintances, and employees,
19 in an effort to obtain the drugs "by any means necessary";

20           d.   STALEY would solicit investors for his COVID-19 treatment
21 kit venture, including by promising extraordinary returns on their
22 investments over a short time period;

23           e.   STALEY would contact Chinese suppliers who claimed to be
24 selling kilogram-quantities of hydroxychloroquine powder for import to
25 the United States and would plan with them to use false statements,
26 including false classifications as to quality and value, to deceive U.S.
27 Customs to help ensure that the shipments would be admitted into the
28 United States, and would not be rejected or delayed;

4

1          f.   In discussions with a potential new customer, STALEY

2    would make false promises about the ability of Skinny Beach's advertised

3    medicines to cure or provide immunity from COVID-19;

4          g.   After learning he was the subject of a criminal

5    investigation, STALEY would try to conceal his fraud by writing messages

6    to a Chinese supplier falsely suggesting that he had not planned with

7    them to deceive U.S. Customs;

8       10.  To carry out the scheme, STALEY committed, caused, and

9    directed the following acts in execution, among others:

10         a.   On or about March 27, 2020, STALEY caused to be sent an

11   email to thousands of potential customers containing "[q]uick thoughts

12   on the COVID-19 pandemic from Dr. Staley" and adding "Dr. Staley's team

13   now offering COVID-19 treatment packs with telemedicine assessment:

14   hydroxychloroquine and azithromycin kits now available!"; in that email,

15   STALEY and Skinny Beach claimed that:

16              i.   Potential customers should "NOT BELIEVE THE REPORTS

17   THAT HYDROXYCHLOROQUINE DOESN'T WORK!";

18              ii.  China and India had just halted exports of

19   hydroxychloroquine to the United States and asked, "Why would they do

20   that if it doesn't work?";

21              iii. "The government [was] telling doctors and

22   pharmacists NOT to use a potentially 100% curative medication in the

23   middle of a war against a lethal virus";

24              iv.  STALEY had "secured a limited supply of these meds

25   and [was] now making them available to patients through telemedicine";

26   and

27              v.   COVID-19 treatment packs were available for purchase

28   at a linked website, which included an offer for "COVID-19 Medicine

1  Resistance Pack (Family)," which included hydroxychloroquine, for
2  $3,995;

3          b.   On or about March 28, 2020, STALEY sent a direct message
4  to a Skinny Beach employee (Employee 1) asking whether Employee 1 had
5  any "extra" tablets of hydroxychloroquine from Employee 1's existing
6  prescription for lupus, claiming that STALEY intended to use them for
7  another Skinny Beach employee who was experiencing COVID-19 symptoms;

8          c.   On or about March 29, 2020, without Employee 1's
9  knowledge or consent, STALEY wrote a sham prescription for Employee 1
10  (listing Employee 1's name, date of birth, and prior residential address)
11  for 180 tablets of 200mg hydroxychloroquine, supposedly to treat
12  rheumatoid arthritis, which was not a condition that Employee 1 suffered
13  from; STALEY subsequently filled the prescription at an online pharmacy
14  and obtained 90 tablets of hydroxychloroquine for himself by pretending
15  to be Employee 1, as further described in paragraph 10.f.;

16          d.   On or about March 30, 2020, STALEY sent a direct message
17  to "Kevin Yang," a supposed seller of kilogram-quantities of
18  hydroxychloroquine powder, on the Chinese online sales platform Alibaba;
19  as part of his direct message exchange with Yang, STALEY asked, "[W]hat
20  permissions will I need to get the product through US Customs?"; Yang
21  answered, "We can change the product name to export, for example, we can
22  replace hydroxychloroquine export with yam extract"; STALEY replied,
23  "[E]xcellent"; days later, STALEY touted to a potential new customer
24  that he "got the last tank of . . . hydroxychloroquine smuggled out of
25  China, Sunday night at 1:00 a.m. in the morning," and added that the
26  broker "smuggled it out . . . by saying it was sweet potato extract";

27          e.   On or about March 30, 2020, STALEY suggested the same
28  mislabeling technique to another supposed Alibaba seller, "Evan Du,";

6

1   STALEY asked Du about a separate shipment of hydroxychloroquine powder
2   that they were negotiating, "Will it get held up in US customs?"; Du
3   replied, "[W]hether it can be released by US customs, to be honest, we
4   are not sure we don't know what will US customs require"; STALEY wrote
5   back, "Will you label it as yam extract? Maybe we can label the shipment
6   paperwork to not raise flags"; Du responded, "[S]orry, we must do it
7   legally should label as it is otherwise the customs won't release";

8           f.   On  or  about  March  31,  2020,  without  Employee  1's
9   knowledge  or  consent,  STALEY  submitted  an  order  for  180  tablets  of
10  hydroxychloroquine at online pharmacy H.H., purportedly for Employee 1
11  but in truth to use the tablets for his COVID-19 venture; during the
12  online submission process, STALEY answered a series of questions—such
13  as, "Do you have any drug allergies?"—as if he were Employee 1; STALEY
14  and Skinny Beach paid H.H. $90.00 for the 90 tablets he was able to
15  obtain, for a price of roughly $1 per tablet;

16          g.   On or about March 31, 2020, STALEY submitted an order for
17  hydroxychloroquine for a friend (Associate 1) at online pharmacy H.H.;
18  during  the  online  submission  process,  STALEY  answered  a  series  of
19  questions—such as, "Do you have any health conditions?"—as if he were
20  Associate 1;

21          h.   On or about April 1, 2020, STALEY faxed a copy of the
22  sham prescription for Employee 1 bearing the false rheumatoid arthritis
23  diagnosis to online pharmacy H.H. in order to fill STALEY's order for
24  hydroxychloroquine supposedly for Employee 1;

25          i.   On or about March 31 and April 1, 2020, STALEY submitted
26  an order for 180 tablets of hydroxychloroquine for Employee 1 and a
27  separate order for 180 tablets of hydroxychloroquine for Associate 1 at
28  online pharmacy H.W.H.; STALEY faxed a copy of the sham prescription for

1  Employee 1 and a copy of a prescription for Associate 1 to online
2  pharmacy H.W.H.;

3        j.   On or about April 2, 2020, based on STALEY's order, online
4  pharmacy H.H. mailed a prescription bottle containing 90 tablets of
5  hydroxychloroquine prescribed to Employee 1 to Skinny Beach's Carmel
6  Valley location; STALEY kept the tablets for himself to use in his
7  COVID-19 venture instead of providing them to Employee 1;

8        k.   On or about April 3, 2020, STALEY told an undercover
9  agent who claimed to be a prospective customer interested in Skinny
10 Beach's COVID-19 treatment kits (UC-1) that personal protective
11 equipment was "not going to save you," but added that he had a small
12 amount of "anti-malarials, which cures the disease"; during the call,
13 STALEY made the following statements about the drugs that he was
14 promoting to UC-1:

15              i.   That hydroxychloroquine was "incredible," and that
16 "there has never before, except for Hepatitis C, been . . . in the
17 history of medicine . . . a situation where a medication is completely
18 curative of a virus";

19              ii.  That if UC-1 was coughing and short of breath at
20 noon today, after starting UC-1's hydroxychloroquine dose, UC-1 would
21 feel "ninety-nine percent better by noon tomorrow";

22              iii. That mefloquine, which STALEY described as the
23 "Russian cure," was an effective alternative to hydroxychloroquine in
24 treating COVID-19;

25              iv.  When UC-1 asked if hydroxychloroquine and mefloquine
26 would effectively cure someone infected with COVID-19, STALEY answered,
27 "One hundred percent.  One hundred percent."; STALEY added that UC-1
28 would also be immune for at least six weeks after taking the drugs;

8

1          v.     That hydroxychloroquine was a "magic bullet" and an
2     "amazing weapon";

3          vi.    That   hydroxychloroquine   was   "preventative   and
4     curative," was "almost too good to be true," was "a remarkable clinical
5     phenomenon," was an "amazing cure," and was a "miracle cure";

6          vii.   That while STALEY noted "[t]here are no guarantees
7     in life," in response to UC-1's question whether STALEY would guarantee
8     that UC-1 would be protected after taking the drugs, STALEY would "bet
9     [his] life on" the treatment, including the use of mefloquine; and

10         viii.  That UC-1 could "sell [his kits] on eBay for twenty-
11    five hundred a pop" if he wished;

12         l.     On or about April 3, 2020, discussing hydroxychloroquine
13    with a prospective customer (Customer 1), referring to U.K. Prime
14    Minister Boris Johnson, who was then hospitalized with a serious case
15    of  COVID-19,  STALEY  told  Customer  1  that  if  Johnson  were  on
16    hydroxychloroquine, he would be "completely cured";

17         m.     On or about April 5, 2020, STALEY told a Skinny Beach
18    customer, who later purchased three of STALEY's COVID-19 treatment kits
19    and whom he was soliciting to invest in his COVID-19 treatment kit
20    venture (Customer 2), that he was seeking a $25,000 minimum investment
21    and aiming to raise $350,000 in total; STALEY told Customer 2 that if
22    Customer 2 invested, STALEY would sign a promissory note that "yields a
23    repayment of triple your money in 90 days";

24         n.     On or about April 5, 2020, STALEY ordered a capsule-
25    filling  machine  from  a  Chinese  company  for  use  in  turning
26    hydroxychloroquine powder into capsules that could be sold to and taken
27    by Skinny Beach customers and others;

28

1        o.    On or about April 6, 2020, STALEY finalized the terms of

2 UC-1's order for six COVID-19 treatment kits from Skinny Beach for $4,000

3 and spontaneously offered UC-1 both Viagra and Xanax;

4        p.    On or about April 6, 2020, after collecting UC-1's

5 payment of $4,000, without meeting UC-1, STALEY mailed the agreed-upon

6 six COVID-19 treatment kits to UC-1, consisting of four sets of drugs

7 containing hydroxychloroquine, two sets of drugs containing chloroquine,

8 six sets of azithromycin, one bottle of 30 tablets of generic Viagra,

9 and one bottle of 30 tablets of generic Xanax;

10       q.    On or about April 6, 2020, STALEY solicited help from a

11 customs broker with kilogram-quantity shipments of hydroxychloroquine

12 powder from China; STALEY told the broker, "HQ powder coming in from

13 china very discrete [sic]. need you big time now bud, its [sic] the end

14 of the world"; when the broker asked whether STALEY was referring to

15 "Hydroquinone Powder," STALEY clarified, "hydroxychloroquine powder C19

16 cure";

17       r.    On or about April 7, 2020, STALEY received a quote for

18 rush chemical analysis of hydroxychloroquine powder from a San Diego

19 chemical analysis firm;

20       s.    On or about April 9, 2020, STALEY caused to be sent by

21 international private carrier a shipment of 12 kilograms of powder that

22 he believed to be hydroxychloroquine powder intentionally mislabeled as

23 "yam extract" addressed to his attention at Skinny Beach's Carmel Valley

24 location (though in fact, unbeknownst to STALEY, the contents of the

25 shipment was actually baking soda);

26       t.    On April 10, 2020, when asked by federal agents whether

27 Skinny Beach had ever said that its COVID-19 treatment packages were a

28 "one hundred percent effective cure," STALEY sought to conceal his

10

1  fraudulent conduct from law enforcement by answering, "No . . . that
2  would be foolish.  We would never have said anything like that"; when
3  asked about obtaining hydroxychloroquine from China, STALEY further
4  sought to conceal his scheme by falsely reporting that for "non-narcotic
5  meds, and vitamins . . . [it] gets through Customs, so that . . . we
6  don't have to mislabel it or anything";

7          u.    On or about April 13, 2020, negotiating the purchase of
8  another shipment of multiple kilograms of hydroxychloroquine powder from
9  a second Chinese supplier on Alibaba, STALEY wrote in a direct message,
10 "The most important thing is that we get the product here without it
11 being detained and we need to do that by any means necessary";

12         v.    On April 16, 2020, when asked by federal agents during a
13 warrant search of Skinny Beach whether, before he sent out the
14 medications as part of his family treatment kits, STALEY obtained all
15 of the relevant information about each family member, STALEY falsely
16 replied, "Absolutely"; when asked about the source of his
17 hydroxychloroquine tablets, STALEY falsely claimed that Employee 1 had
18 "allowed [him] to use her lupus diagnosis to order whatever tabs is on
19 that bottle . . . from [H.H.];"

20         w.    On April 16, 2020, following a warrant search of Skinny
21 Beach by federal agents and notification of a criminal complaint filed
22 against him, STALEY sought to conceal his scheme from law enforcement
23 by contacting Yang and falsely claiming, "I thought we labeled it
24 properly as HXQ [hydroxychloroquine] because the chinese [sic] export
25 ban was lifted?" Yang responded, "[W]e did not label HXQ. We pasted yam
26 extract, which we agree from the beginning.";

27         x.    On April 17, 2020, the day of his arraignment and roughly
28 eight days after the powder had shipped, STALEY continued his effort to

conceal his scheme by telling Yang, "We need to have it properly labeled as hydroxychloroquine or it won't make it through customs," and requesting that Yang relabel the shipment, "[o]therwise we are facing potential criminal charges and FBI investigation for something we did not intend to deceive customs.";

11. For the purpose of executing and attempting to execute the above-described scheme, on or about the following dates, within the Southern District of California and elsewhere, STALEY knowingly caused to be sent and delivered by mail and by private and commercial interstate carrier the following mailings:

a. **Count 1**: On or about April 2, 2020, a package sent by U.S. mail from Culver City, California to Skinny Beach in Carmel Valley, California containing a prescription bottle bearing Employee 1's name filled with 90 tablets of 200 milligrams of hydroxychloroquine sulfate.

b. **Count 2**: On or about April 9, 2020, a package delivered by U.S. mail containing a family-sized "COVID-19 Treatment Pack" sent from Skinny Beach in Carmel Valley, California to UC-1 in exchange for payment of $4,000; and

c. **Count 3**: On or about April 9, 2020, a package containing 12 kilograms of powder which STALEY believed to be hydroxychloroquine and which was intentionally mislabeled "yam extract," sent via private carrier DHL from Shaanxi, China and addressed to be delivered to STALEY at Skinny Beach in Carmel Valley, California.

All in violation of Title 18, United States Code, Section 1341.

### Count 4
### Importation Contrary to Law
### 18 U.S.C. § 545

12. Paragraphs 1 through 5 are hereby incorporated by reference as if fully stated herein.

12

1    13.  On or about April 16, 2020, within the Southern District of
2  California, defendant JENNINGS RYAN STALEY did fraudulently and
3  knowingly import and bring into the United States, and willfully cause
4  to be imported and brought into the United States, merchandise, to wit,
5  12 kilograms of baking soda labeled as yam extract, contrary to law, in
6  that he knowingly effected the entry of such merchandise upon a false
7  classification as to quality and value, in violation of Title 18, United
8  States Code, Section 541.
9  All in violation of Title 18, United States Code, Sections 545 and 2.

10                              **Count 5**
                            **False Statement**
11                        **18 U.S.C. § 1001(a)(2)**

12    14.  Paragraphs 1 through 5 are hereby incorporated by reference
13  as if fully stated herein.

14    15.  On or about April 10, 2020, within the Southern District of
15  California, defendant JENNINGS RYAN STALEY did knowingly and willfully
16  make a materially false, fictitious, and fraudulent statement and
17  representation in a matter within the jurisdiction of the executive
18  branch of the Government of the United States by stating and representing
19  to agents from the Federal Bureau of Investigation that STALEY and Skinny
20  Beach did not say that Skinny Beach's treatment packages were a one
21  hundred percent effective cure for COVID-19, that saying so would be
22  foolish, and that "we would never have said anything like that," which
23  statements and representations were false because, as defendant STALEY
24  then and there well knew, he had told a potential customer, UC-1, a week
25  earlier that hydroxychloroquine was "completely curative," a "magic
26  bullet," an "amazing cure," and a "miracle cure," and when asked by
27  UC-1 if hydroxychloroquine and mefloquine would effectively cure someone
28

                                   13

1 infected with COVID-19, STALEY answered, "One hundred percent. One
2 hundred percent."

3 All in violation of Title 18, United States Code, Section 1001(a)(2).

**Count 6**
**False Statement**
**18 U.S.C. § 1001(a)(2)**

6       16.  Paragraphs 1 through 5 are hereby incorporated by reference
7 as if fully stated herein.

8       17.  On or about April 16, 2020, within the Southern District of
9 California, defendant JENNINGS RYAN STALEY did knowingly and willfully
10 make a materially false, fictitious, and fraudulent statement and
11 representation in a matter within the jurisdiction of the executive
12 branch of the Government of the United States by stating and representing
13 to agents from the Federal Bureau of Investigation and the Food and Drug
14 Administration, Office of Criminal Investigations, that STALEY's
15 employee, Employee 1, "allowed [him] to use her lupus diagnosis to order
16 whatever tabs is on that bottle . . . from [H.H.]," which statements and
17 representations were false because, as defendant STALEY then and there
18 well knew, Employee 1 did not give STALEY permission to use her personal
19 medical information to write a prescription for hydroxychloroquine and
20 did not even know that STALEY had done so, and because STALEY used a
21 false diagnosis of rheumatoid arthritis for the prescription instead of
22 Employee 1's true diagnosis of lupus.

23 All in violation of Title 18, United States Code, Section 1001(a)(2).

**Count 7**
**False Statement**
**18 U.S.C. § 1001(a)(2)**

27       18.  Paragraphs 1 through 5 are hereby incorporated by reference
28 as if fully stated herein.

14

1    19.   On or about April 16, 2020, within the Southern District of
2  California, defendant JENNINGS RYAN STALEY did knowingly and willfully
3  make a materially false, fictitious, and fraudulent statement and
4  representation in a matter within the jurisdiction of the executive
5  branch of the Government of the United States by stating and representing
6  to agents from the Federal Bureau of Investigation and the Food and Drug
7  Administration, Office of Criminal Investigations, that "Absolutely!"
8  STALEY and Skinny Beach would get all of the relevant information about
9  each family member before sending out medications in a COVID-19 family
10  treatment kit, which statements and representations were false because,
11  as defendant STALEY then and there well knew, STALEY and Skinny Beach
12  did not obtain the names, dates of birth, medical history, or any
13  information about drug allergies and interactions for any of UC-1's
14  purported family members, or any such information (other than UC-1's
15  name) for UC-1 before shipping six COVID-19 kits to UC-1 on or about
16  April 6, 2020.

17  All in violation of Title 18, United States Code, Section 1001(a)(2).

18                           **Count 8**
                     **Aggravated Identity Theft**
19                      **18 U.S.C. § 1028A**

20    20.   Paragraphs 1 through 5 are hereby incorporated by reference
21  as if fully stated herein.

22    21.   On or about March 31, 2020, within the Southern District of
23  California and elsewhere, defendant JENNINGS RYAN STALEY, during and in
24  relation to a felony violation of Title 18, United States Code,
25  Section 1341 (Mail Fraud), knowingly transferred, possessed, and used,
26  without lawful authority, a means of identification of another person,
27  to wit, the name, date of birth, and former residential address of

28

1 | Employee 1 on a sham prescription, knowing that the means of
2 | identification belonged to another actual person.

3 | All in violation of Title 18, United States Code, Section 1028A.

4 | **CRIMINAL FORFEITURE**

5 | 22. The allegations contained in this Superseding Indictment are
6 | hereby realleged and incorporated by reference for the purpose of
7 | alleging forfeitures pursuant to Title 18, United States Code,
8 | Sections 545, 981(a)(1)(C), and 982(a)(2)(B), and Title 28, United
9 | States Code, Section 2461(c).

10 | 23. Upon conviction of one or more of the offenses in violation
11 | of Title 18, United States Code, Section 1341 set forth in Counts 1
12 | through 3 of this Superseding Indictment, defendant JENNINGS RYAN STALEY
13 | shall forfeit to the United States of America, pursuant to Title 18,
14 | United States Code, Section 981(a)(1)(C), and Title 28, United States
15 | Code, Section 2461(c), all property, real and personal, which
16 | constitutes or is derived from proceeds of the offenses and all property
17 | traceable to such property.

18 | 24. Upon conviction of the offense in violation of Title 18, United
19 | States Code, Section 545 set forth in Count 4 of this Superseding
20 | Indictment, defendant JENNINGS RYAN STALEY shall forfeit to the United
21 | States of America, pursuant to Title 18, United States Code, Section 545,
22 | all merchandise introduced into the United States, in violation of
23 | Section 545, or the value thereof, and, pursuant to Title 18, United
24 | States Code, Section 982(a)(2)(B), all property, real and personal,
25 | which constitutes or is derived from proceeds of the offense and all
26 | property traceable to such property.

27 | //

28 | //

16

1    25.   If any of the property described above, as a result of any act
2  or omission of the defendant:

3              a.    cannot be located upon the exercise of due diligence;
4              b.    has been transferred or sold to, or deposited with, a
5  third party;

6              c.    has been placed beyond the jurisdiction of the court;
7              d.    has been substantially diminished in value; or
8              e.    has been commingled with other property that cannot be
9  divided without difficulty, the United States of America shall be
10 entitled to forfeiture of substitute property pursuant to Title 18,
11 United States Code, Section 298(b) and Title 28, United States Code,
12 Section 2461(c).

13 All pursuant to Title 18, United States Code, Sections 545, 981(a)(1)(C),
14 and 982(a)(2)(B), and Title 28, United States Code, Section 2461(c).

15       DATED:   December 2, 2020.

16                                         A TRUE BILL:

17

18                                         Foreperson

19 ROBERT S. BREWER, JR.
   United States Attorney
20
21 By:
       NICHOLAS W. PILCHAK
22     JACLYN STAHL
       Assistant U.S. Attorneys
23

24

25

26

27

28
                                   17