RANDY S. GROSSMAN
United States Attorney
NICHOLAS W. PILCHAK
California Bar No. 331711
JACLYN STAHL
California Bar No. 295467
Assistant U.S. Attorneys
U.S. Attorney's Office
880 Front Street, Room 6293
San Diego, CA 92101
Telephone: (619) 546-9709 / 8456
Email: nicholas.pilchak@usdoj.gov

Attorneys for the United States

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br>v.<br><br>JENNINGS RYAN STALEY,<br><br>Defendant. | Case No. 20-CR-1227-GPC<br><br>**UNITED STATES' SENTENCING MEMORANDUM**<br><br>Date:    May 27, 2022<br>Time:    8:30 a.m. |

During the desperate days early in the COVID-19 pandemic, when millions of Americans were fearful of the new virus sweeping the globe, Dr. Jennings Staley waded into the mix marketing concierge medicine packages costing thousands of dollars and built around hydroxychloroquine ("HCQ"). In the only patient contact that was fully recorded—with an FBI undercover agent posing as a potential patient—Dr. Staley made extreme claims about HCQ, calling it a "magic bullet," an "amazing weapon," "the perfect antidote," an "amazing cure," and describing it as "one hundred percent" effective. He also bragged (unprompted) that he had gotten "the last tank of hydroxychloroquine smuggled out of

China."  This turned out to be almost correct, in that Staley had arranged for a supplier to mislabel what he thought was a 26-pound shipment of HCQ powder to sneak it past U.S. Customs.  Finally, Staley misappropriated his employee's identity to write a prescription in her name for HCQ, which he then sold as part of his treatment kits.

Taking all of Dr. Staley's conduct together and weighing it in its proper context, the United States recommends a sentence of twelve months and a day in custody and three years of supervised release with all of the conditions recommended by Probation.  The parties also jointly recommend a $10,000.00 fine and forfeiture of $4,000.00.

# I.

# STATEMENT OF FACTS

## A.   COVID-19 and Hydroxychloroquine

By late March 2020, the COVID-19 pandemic was well underway, and no vaccines had yet emerged to ward off the novel coronavirus.  Some signs pointed to hydroxychloroquine (HCQ)—a widely used anti-malarial medication also prescribed for chronic conditions like lupus and rheumatoid arthritis—as a potentially effective treatment for COVID-19.[1]  Coupled with statements from public officials, these signs created enormous interest in HCQ as a potential treatment for the new virus.

On March 28, 2020, the FDA issued an Emergency Use Authorization (EUA) for the provisional use of chloroquine and HCQ to treat COVID-19.  The EUA explained that these two drugs were not FDA-approved for the treatment of COVID-19, but it authorized the use of the drugs held in the Strategic National Stockpile under strict conditions (like hospitalized observation) when clinical trials were not available, or participation was not feasible.[2]

---

[1]     For example, on March 20, 2020, a French study (P. Gautret et al.) released a preprint claiming that all (six) of its patients treated with a combination of HCQ and azithromycin recovered from COVID-19.  The study generated enormous media coverage.

[2]     The FDA later revoked this EUA on June 15, 2020 based on further analyses and new evidence of HCQ's limited therapeutic value.

**B.    Dr. Staley and Skinny Beach Med Spa**

Dr. Staley is a medical doctor licensed by the State of California who operated a series of med spa establishments (under the trade name "Skinny Beach Med Spa").[3]  Both Dr. Staley and his business were already in dire financial straits well before the onset of COVID-19.   For example, one employee explained the med spa had its internet disconnected for failure to pay its bill, employees often received their paychecks late, and some customer appointments had to be canceled because the spa was short on supplies for financial reasons.

**C.    Dr. Staley Seeks to Profit from the Pandemic**

In March 2020, the burgeoning global pandemic sharpened Staley's financial peril by forcing a shutdown of his med spas.  Drawing on his past experience as a military physician, Staley nevertheless perceived a silver lining: a business opportunity to prescribe HCQ as part of a "treatment pack" that he could sell to a desperate subset of his clients and the public.

### 1.    Dr. Staley's promotional emails

On March 27, 2020, Skinny Beach sent a promotional email under the subject line "COVID-19 Treatment Packs Now Available!" to thousands of individuals on its mailing list.  The email, which Staley admitted that he personally drafted, began with a few hedges but quickly claimed that HCQ was emerging as the "standard of care" for COVID-19 patients, and that it is "proving effective globally."  Specifically, Staley noted that the supposed hydroxychloroquine plus azithromycin "standard of care" was in place in China, India, Taiwan and South Korea, "leading to dramatic declines in numbers of cases and mortality rates worldwide."  Staley urged, "DO NOT BELIEVE THE REPORTS THAT HYDROXYCHLOROQUINE DOESN'T WORK!"

---

[3]    On May 2, 2022, Dr. Staley agreed to a voluntary temporary suspension of his medical license while he undergoes residential substance abuse treatment.  The Medical Board has indicated that they intend to pursue other sanctions against him.

Staley's promotional email cited a news article claiming that China and India had just halted all exports of hydroxychloroquine to the United States, and asked, "Why would they do that if it doesn't work?" Staley observed that the United States had "a limited supply [of the drugs] that likely will not increase in time to treat moderate symptoms at home, and [] is available only by prescription." Criticizing the Michigan governor's warning to doctors not to use HCQ, Staley wrote, "The government telling doctors and pharmacists NOT to use a potentially 100% curative medication in the middle of a war against a lethal virus . . . ? I would not believe this could happen if you told me a month ago, but sadly it is."

Staley went on to note that he had secured "a limited supply" of HCQ and was making it available in connection with "a concierge medicine experience" to select customers. The email concluded with a link to an online sales page offering COVID-19 treatment kits, including a four-pack "COVID-19 Concierge Medicine Resistance Pack (Family)"—including hydroxychloroquine—for $3,995. Staley's bold marketing campaign caused several individuals to report his conduct to law enforcement, which sparked a criminal investigation.

### 2. Dr. Staley arranges to smuggle HCQ into the United States.

Staley's next priority was securing as much HCQ as he could to meet the anticipated demand drummed up by his marketing email. According to chat logs from Alibaba—a Chinese online marketplace like Amazon—Staley approached three Chinese merchants on March 30, 2020, seeking to purchase 100 kilograms of HCQ. This led to the following exchange with one merchant, "Kevin Yang":

| *Staley* | what permissions will I need to get the product through U.S. Customs? | |
| | we can change the product name to export, for example, we can replace hydroxychloroquine export with yam extract | *Yang* |
| *Staley* | excellent | |

Staley's enthusiasm for the "yam extract" idea was confirmed less than 30 minutes later when he suggested that technique himself to one of the other Chinese suppliers with whom he was communicating, "Evan Du":

| Staley | Will it get held up in US customs? Can I get Alibaba trade assurance? | |
| --- | --- | --- |
| | whether it can be released by US customs, to be honest, we are not sure . . . we don't know what will US customs require | Du |
| Staley | Will you label it as yam extract? Maybe we can label the shipment paperwork to not raise flags | |
| | sorry, we must do it legally should label as it is otherwise the customs won't release | Du |

Staley ultimately placed the order with Yang for 12 kilograms of HCQ powder for roughly $6,830. Based on an alert placed by the investigative team, U.S. Customs seized a drum containing 12 kilograms of white powder (mislabeled as yam extract) addressed to Skinny Beach Med Spa and mailed from Shaanxi, China. The commercial invoice accompanying the drum falsely claimed that Skinny Beach had paid only $60 for it. When tested, the white powder inside was determined to be baking soda, revealing that Staley himself had been duped by another unscrupulous profiteer taking advantage of the pandemic.

For his part, Staley had been laying the groundwork for importing HCQ and turning it into a salable product. He asked an acquaintance with a customs broker business to help import a separate shipment of HCQ powder from a different Chinese merchant. Staley had suggested to that merchant that they split the order into two shipments to be sure that one would get past Customs, explaining "The most important thing is that we get the product here without it being detained and we need to do that by any means necessary." In his emails with the U.S. customs broker, Staley explained that he had a shipment of "HQ

powder coming in from china very discrete [sic]," and when the broker asked him what he meant, Staley wrote "hydroxychloroquine powder. C19 cure."

Staley's plan was to use the HCQ powder to fill hundreds or thousands of capsules in his med spa, according to seized communications and confirmed by a capsule-filling device recovered during the search of Skinny Beach.  In preparation, Staley had contracted with a U.S. testing company to verify the composition of the powder from China, reflecting his own concerns about the purity of the Chinese drugs he was attempting to smuggle. When Staley's multi-kilogram shipment of HCQ was intercepted, however, these plans were frustrated.

### 3.    Dr. Staley steals his employee's identity to fill a straw HCQ prescription.

One of Staley's employees was a longtime lupus sufferer with a preexisting HCQ prescription for her condition.  When she saw a Skinny Beach Facebook post about selling HCQ, she messaged the practice to say she was glad she had recently gotten her own HCQ prescription refilled.[4]  In response, Staley direct messaged his employee to ask whether she had any "extra" HCQ tabs, claiming he needed them for another nurse who was sick with COVID-19 and who had been turned away from the emergency room.  The employee texted Staley to ask why he couldn't write a prescription for the sick nurse, but Staley never responded.  Instead, the employee texted Staley's wife the next day, saying, "If one of our nurses is sick, I would gladly give a few of my tablets to them. I take it for lupus…I am a bit worried I will have trouble getting it refilled in the future."  She added, "I look forward to getting back to work on the other side of this pandemic. Anything I can do to help Skinny Beach flourish! Just know I am all in!"

Leveraging his employee's existing access to an increasingly scarce drug, Staley wrote a straw prescription for 180 tablets of HCQ in her name.  Staley's straw prescription

---

[4]    HCQ prescriptions were indeed skyrocketing at the time.  For example, a later CDC paper found that HCQ prescriptions for adult males increased 16-fold, comparing March 2019 with March 2020.

listed an inaccurate diagnosis of non-specific rheumatoid arthritis ("RA"), but bore the employee's (correct) date of birth and (prior) residential address—which Staley had apparently purloined from her employment file.  Staley's falsified prescription claimed that his employee had been diagnosed with RA in "Spring 2018," when in truth Staley had never been the employee's doctor and the diagnosis and diagnosis date were both invented.  Staley submitted the prescription at an online pharmacy, where he also answered a questionnaire as if he were the employee (responding to questions such as "Are you currently taking any other medications?" and "Do you have any drug allergies") to complete the order.  Staley also personally fielded a verification call from the pharmacist, who wanted to confirm the employee's RA diagnosis and that Staley was treating her in the scope of his practice.  After the call, the online pharmacy shipped 90 tablets of HCQ to Staley's med spa location, addressed to the employee.[5]  Staley paid roughly $1 per tablet.

**D.   Dr. Staley Claims HCQ Is A "Guaranteed Cure"**

### 1.    *Dr. Staley makes extended, extreme claims about HCQ*

In response to a raft of complaints, an undercover FBI agent (the "UC") reached out to Skinny Beach at the email address listed in its promotional emails, and ultimately received a call from Dr. Staley on April 3, 2020.  The recorded call lasted 55 minutes; Staley did virtually all the talking.  The UC inquired about purchasing medication for himself, his wife, his elderly father, and their minor children.

Staley began by referencing personal protective equipment, dismissing its importance by adding that "the masks, the gloves, that's not going to save you."  He immediately pivoted to HCQ, noting that, "we do have a small amount of medication, the anti-malarials, which cures the disease, I've seen it three times. It's remarkable!"

Discussing HCQ, Staley enthused: "It's um, it's incredible!  I've nev—there has never before, except for Hepatitis C, been in—in the history of medicine, been a situation

---

[5]      Staley also submitted the employee's straw prescription at a second online pharmacy but canceled that order before it was filled.

where a medication is completely curative of a virus." Staley claimed: "these people not only feel better, look better but like inflammation disappears. . . . Like, you can be short of breath and coughing on, at noon today and if I start your hydroxychloroquine loading dose, you'll feel ninety-nine percent better by noon tomorrow."

Staley bragged—completely unsolicited—"I got the last tank of, uh, hydroxychloroquine, smuggled out of China, Sunday night at 1:00 a.m. in the morning," adding, "the broker, uh, smuggled it out, so to speak, otherwise tricked Customs by saying it was sweet potato extract." The UC laughed and said, "That's fantastic!" Staley replied, "We got 8,000 doses coming in. It will be here at 4:00 today and I think the British government is buying it."

Staley told the UC that he only had six kits of hydroxychloroquine left, but suggested mefloquine as an alternative—describing it as "the Russian cure." The UC asked, "I don't know all this so the—the um, both drugs the mefloquine and the hydroxychloroquine and um, az–azithromycin combo. Both of them will like, if you are infected it will effectively cure you? Is that what you're saying? Or is it–?" Staley replied, "One hundred percent. One hundred percent." He added, "the half-life is 30 to 40 days, so you'll actually be protected, immune for at least six weeks, after you take your doses." The UC replied "Oh wow!" and Staley said "Yeah, that's rad—it's rad."

Launching another monologue, Staley said, "It's this magic bullet that was laying right there. This amazing weapon and due to politics, thousands of people are gonna die because they argued over it." Explaining the origins of mefloquine, Staley said "it's been tested against coronavirus as well. One hundred percent effective. It's the Russian cure. Google 'Russian cure'—they're bragging about it in their state paper in Russia, because they have a low death rate. Because they stockpiled this early on."

Staley cautioned the UC that the UC was not to take the medication unbidden, but only when Staley told him. Staley was clear, however, that he would provide the medication up front upon payment.

Later, Staley again explained how the drug would work: "[I]t literally impairs the virus' ability, it kills the virus and it prevents it from binding to the cells. So it's—it's, uh, preventative and curative. It's, it's, it's, it's hard to believe; it's almost too good to be true, but it's a remarkable clinical phenomenon."  Going further, Staley added that "it almost makes me think" that this is the world's perfect virus, perfectly engineered, that kills people 75 years old and older, and opined that it would be in China's best interest to release such a virus because of their elderly population. Then Staley added that it was also interesting that "you also have the perfect antidote, it's not really [an] antidote, it's like this amazing cure. Like a miracle cure, drug."

Substantially later in the call, when the UC asked once again if Staley would "guarantee" the treatment's effectiveness, Staley hedged, adding "there are no guarantees in life."  But for good measure, he added, "I bet my life on it."  Ultimately, Staley agreed to sell the UC six of his COVID-19 treatment kits for $4,000.

### 2.    *Dr. Staley throws in some Viagra and Xanax*

On April 6, 2020, the UC called Staley on his cell phone to finalize the transaction. Staley admitted that he was low on HCQ and could supply only four HCQ kits and would have to substitute chloroquine for the final two.

Then, completely out of the blue, Staley offered, "Did you need Viagra, Xanax? . . . We can ship you that."  The UC laughed and responded, "Yeah!  I mean, who doesn't need those things?"  Staley said it came with the concierge package, and would be provided "[a]s long as you don't have nitrates or coronary artery disease?"  Before giving the UC a chance to respond to this question, Staley asked "You wanna bottle of 100mg Viagra?"  The UC said yes, and Staley added, "And then you need any Xanax?"[6]  The UC replied, "Yeah, um, why not?  Yeah, I mean sounds great."  Staley told him to just take half a tab and said it would help him sleep because "there's a lot of panic going on right now."  At no point did

---

[6]    Xanax is a federally controlled substance.  As described in more detail below, Dr. Staley is currently in administrative proceedings in which the DEA seeks to revoke his several licenses to prescribe controlled substances.

Staley ask any medical questions about the UC's family members' health conditions or personal well-being, including his supposed minor children.

Skinny Beach mailed the treatment kits to the UC on April 6, 2020, and the FBI received the kits on April 9. The package contained six boxes of azithromycin, four envelopes of 5 hydroxychloroquine 200 mg tablets, 2 clear baggies of 20 chloroquine 200 mg tablets, a bottle of 30 generic Viagra tablets, and a bottle of 30 generic 1 mg Xanax tablets. The package also included four Skinny Beach business cards and a government fact sheet concerning chloroquine use under the FDA's EUA for chloroquine. No fact sheet for hydroxychloroquine was included.

**E.    Dr. Staley Plans To Sell HCQ To The British Government**

After receiving threats from individuals because of his HCQ marketing, Staley hired contract security guards at his main Skinny Beach location. One of those guards became so concerned about what he overheard during his single day working for Staley that—before contacting law enforcement—he independently surreptitiously recorded some of Staley's conversations on his cell phone.[7]

---

[7]    Staley professes to be "shock[ed]" that the United States would share these recordings with Probation, because Staley argues that they were illegally made. ECF 78 at 3. But Congress has expressly instructed the courts that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. Staley implicitly references a state law violation for non-consensual recordings—Cal. Penal Code § 632, which may be a felony or a misdemeanor—and alludes to an unspecified federal crime which he believes that the security guard committed. He omits that federal agents instructed the guard to desist from making such recordings once they learned of the existing tapes, and never explains why the United States would be obliged to disregard probative evidence delivered to it by a private party. In fact, it is not. *See United States v. Rosenow*, 33 F.4th 529 (9th Cir. 2022) ("The Fourth Amendment regulates only governmental action; it does not protect against intrusive conduct by private individuals acting in a private capacity."); *see also* USSG § 6A1.3 cmt. ("In determining the relevant facts, sentencing judges are not restricted to information that would be admissible at trial.").

*United States' Sentencing Memorandum*                    10                    20-CR-1227-GPC

The recordings capture a part of Staley's April 3, 2020 in-person meeting with a potential British customer, and their discussion of HCQ and Boris Johnson—the U.K. Prime Minister who was then hospitalized with a severe case of COVID-19.  The guard recorded a small portion of their discussion.  In it, the British customer told Staley about an acquaintance who was connected to the British government, and who could discuss providing an unspecified medicine to the UK.  Staley asked the British customer whether Johnson was on HCQ, and the customer replied, "Clearly not, because he would be better." Staley replied: "He would be better. He would be completely cured."  Discussing an apparent shipment of HCQ, Staley asked whether "[they] will [] take 8 kilos of it?"  Staley added "where I'm selling it now, it's worth about $12 million.  So I would sell it for like $2 million.  Which is basically, it's pharmaceutical arbitrage."[8]

**F.     Dr. Staley Solicits Investors For His Plan**

All of Staley's COVID-19 treatment customers who could be identified were interviewed by agents, and none recalled being told the kinds of extreme promotional statements that Staley made to the UC agent.  Nevertheless, several of Staley's customers did tell agents that Staley had solicited them for investments in his COVID-19 treatment venture.  Staley told one customer (who bought $1,200 worth of COVID kits from Staley) that he planned to import bulk HCQ powder from China and solicited a $10,000 investment. That customer declined.

Staley told another customer (who paid $2,385 for three COVID kits) that he was trying to raise $350,000 for his enterprise and solicited a $25,000 minimum investment from her.  In subsequent text messages to this second customer, Staley referenced signing a promissory note in exchange for her investment, which would "yield[] a repayment of triple your money in 90 days."  This customer didn't invest either.

---

[8]     This comment echoed Staley's remark to the undercover agent that he had 8,000 doses of HCQ coming in, which he planned to sell to the British government.

**G.     Dr. Staley Lies To Investigators To Conceal His Conduct**

Following the undercover purchase, overt FBI agents interviewed Staley twice: once on April 10, 2020 as part of a knock-and-talk, and again on April 16, 2020 during a warrant search of Skinny Beach.  Both consensual interviews were recorded.  Staley lied repeatedly to investigators both times, despite being warned that doing so was a crime.

On April 10, 2020, agents interviewed Staley at Skinny Beach.  After warning him that it was a crime to lie to them, they asked "are you communicating to patients that the hydroxychloroquine is—is a cure?  It's a hundred percent curative?"  Staley answered:

> No, I would be careful not to say that. You know, you-you could put something like that in quotes if someone called it that possibly. But I don't, I, if we ever said that it was a "cure" um, that would have been a mistake. Because, you don't know if they have COVID-19. We don't know there, it's not definitive that it cures it. Right? . . . We don't know enough about the spectrum of the disease. Does it cure it in the first forty-eight hours?  You know, we know you have to take Tamiflu in the first forty-eight hours. Or you're not gonna experience any benefit on influenza, so I'm sure we'll—all of this will be extrapolated out. But, being an important study that they're not—that they're not doing, is what and I think the most valuable question, not does it just work, we know it works. [But] at what stage of the disease would it work is the most important, and what's the minimum effective dose.  Cause if you have a med that you think could be toxic, then why—why wouldn't you say, "well, what let's back down on the daily dose.  And see if we just gave somebody two hundred, [UI] are they better?"  You know?  Do—do we have the same clinical outcome?

The agent immediately sought to clarify: "[S]o you're like in the course of like, uh marketing the—the treatment packages or talking with potential clients, I mean uh, the clin—I mean the Spa has not said that this is a one hundred percent effective cure?"  Staley answered squarely, "No—no, that would be foolish. We would never have said anything like that."

Near the conclusion of the interview, addressing buying medical supplies on Alibaba, Staley noted that he couldn't buy a pill-making machine there because "the DEA, Customs will, there's certain things they can't get through Customs."  He added, "But non-narcotic meds, and vitamins, and stuff and you know, you can get, they can sell you that and—and [it] gets through Customs, so that uh, the Customs uh, we don't have to mislabel anything,

they'll accept Dr. Jennings Staley, is gonna take delivery of twelve kilograms of a pharmaceutical."

On April 16, 2020, agents executed a search warrant at the Skinny Beach Carmel Valley location, interviewed Staley again, and then served him with a notice to appear on a criminal complaint.

Explaining how he obtained HCQ, Staley told the agents about his employee, whom he described as "a nurse that works for me with lupus."  According to Staley, "she allowed me to use her lupus diagnosis to order whatever tabs is on that bottle."  In Staley's telling, he ordered the nurse's prescription to "make sure she had backup" but she was able to fill her prescription at the Del Mar Heights Rite Aid, "So, she said I could keep it. So we used it for sick people."[9]

The agents asked Staley about his process for obtaining medical information about family members before distributing his family pack treatment kits.  He first said, "They've all been seen and evaluated," but immediately backtracked and said, "I have not spoken to the teenage kids."  He added that he usually gave the kit to "the patriarch of the family" but noted that "[w]e talk about each patient," including who is sick, who isn't, whether anyone has asthma or an airway disease, who has comorbidities, and the like. The agents sought to clarify: "Before you send out the meds, you actually get all the information about each family member?"  Staley replied "Absolutely!" Staley also (falsely) denied that he had ever used the mail to ship generic Xanax, a schedule IV controlled substance.

During the warrant search of Skinny Beach, agents recovered 27 tablets of HCQ; 650 tablets of mefloquine; approximately 3,175 tablets of generic Xanax; 50 tablets of generic Viagra; and roughly 996 tablets of azithromycin.  They also seized a handwritten price list; the first product listed is "Cure – $795":

---

[9]     In his earlier interview, Staley had told federal agents that none of his customers were actually diagnosed with COVID-19.



Another contract security guard (not the same one who recorded Staley, as outlined above) admitted that she wrote this list to help Skinny Beach staff keep the treatments and prices straight.  She added that she wrote "cure" because that's what Staley called HCQ and azithromycin, although she claimed that she had never personally seen him use that term with customers.

On April 18, 2020—12 days after sending the UC's drugs, 9 days after the UC received them, after being interviewed by the FBI (twice), and the day after his arraignment in this criminal case, ECF—Staley prepared a prescription for 30 tabs of alprazolam for the UC, listing an apparently invented date of birth.  *See* Exhibit 1.

## II.

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

A.   **<u>Guidelines Calculations.</u>**

1.   ***<u>Introduction</u>***

In their plea agreement, the parties have agreed to jointly recommend the following guidelines calculations:

| | |
|---|---|
| Base offense level [USSG § 2T3.1] | 4 |
| Abuse of trust and special skill [USSG § 3B1.3] | +2 |
| Obstruction of justice [USSG § 3C1.1] | +2 |
| Acceptance of responsibility [USSG § 3E1.1] | -2 |
| Uncharged conduct, § 5K2.0 | +5 |

The base offense level for the importation count of conviction is 4, and there is no upward adjustment for tax loss for the 12 kilograms of baking soda actually contained in the smuggled shipment. *See* USSG § 2T3.1(a)(1).

The United States recommends that Probation calculates certain guidelines differently, but stands by the plea agreement and does not join those calculations. Based on the parties' plea agreement, and for the reasons set out below, the Court should follow these recommended guidelines. Given the seriousness of the offense, the Court should decline to depart, adjust or vary downward any further.

### 2.   *Dr. Staley abused a position of trust and a special skill.*

Staley could only commit this crime by abusing his position as a trusted physician and his special skill as someone who could write prescriptions for a scarce and highly desirable drug. This is exactly the kind of status that warrants an enhancement under USSG § 3B1.3. *See* cmt. n. 4 ("'Special skill' refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing. Examples would include . . . doctors.").

### 3.   *Dr. Staley obstructed justice.*

Across two different interviews, Staley lied repeatedly to federal agents to try to conceal his conduct, even after being warned that doing so was a crime. This justifies an enhancement for obstruction of justice under USSG § 3C1.1. While Staley was not required to plead guilty to the counts charging this conduct as part of the parties' settlement, *see* ECF 40 at 13–15 (Counts 5–7), the parties have expressly agreed that the enhancement applies notwithstanding USSG § 3C1.1 cmt. n. 5. *See* ECF 55 at 8 n.1.

### 4.    <u>*Acceptance of responsibility.*</u>

Staley entered a guilty plea in this case admitting to much of his conduct, which is to his credit.

At the same time, Staley made a series of false or misleading statements under oath in administrative proceedings with the DEA, each of which minimized his conduct in an apparent effort to retain his controlled substances licenses.[10]  For example:

- Staley falsely testified that he "under dosed" two of the six COVID-19 kits sent to the UC, providing half-doses of generic Xanax for the UC's minor children, Exhibit 2 174:16–23, when in truth the kits Staley assembled and mailed contained a full complement of 30 tabs of Xanax, or five tabs for each of the six recipients—including the kids.  *See* PSR ¶ 27.[11]

- Staley falsely testified that the COVID-19 kits mailed to the UC contained a flier with instructions not to take prescription medications until the patient spoke with Dr. Staley, Exhibit 2 180:12–181:14, 182:3–11, when in truth the kits contained no such instructions and instead contained only a copy of the fact sheet for use of chloroquine under the FDA's EUA.  *See* PSR ¶ 27.

- Staley repeatedly told the DEA that he believed the UC was a reporter or a "red flag" patient with suspicious motives and behaviors whom he did not wish to have as a patient.  Exhibit 2 142:14–143:13 (Staley claims he told his companion, "this guy's a fucking reporter 100 percent").  Staley omitted to

---

[10]    At the hearing, Staley generally defended his conduct by claiming (among other things) that he believed he was exercising constructive control over the drugs he sent to patients because he believed the patients would call him for a later evaluation before taking them.  Exhibit 2 205:19–206:6.

[11]    Later, under questioning by the judge, Staley admitted that the Xanax was dispensed in a single bottle under the UC's name but claimed that the tablets were intended for "all adult or eligible members of the family" including the UC's wife, the UC's father-in-law, "and in an unusual situation, possibly a child."  Exhibit 2 214:19–215:5.

mention that when the UC texted him after their conversation, he replied "Sounds good [UC], call me anytime."  Exhibit 3.

- Finally, Staley emphasized to the DEA that he had "ultimately" put the UC's prescription in the CURES database to formally document it in order to legitimize his highly irregular interaction with the UC, never mentioning that this documentation occurred only after Staley was served with notice of the criminal charges in this case.  Exhibit 2 167:5–11.

While all of this conduct is arguably inconsistent with accepting responsibility, in order to give Staley the benefit of his bargain, the United States stands by its recommendation for acceptance.  Nevertheless, the Court should consider this conduct in sentencing Staley in the appropriate guidelines range rather than departing downward.

### 5. *Dr. Staley's conduct beyond the count of conviction supports an agreed-upon upward adjustment.*

As part of the parties' negotiated agreement, Staley pleaded guilty to importation contrary to law.  But his true conduct was substantially broader than that, as acknowledged the factual basis for his plea agreement.  Specifically, in committing the conduct charged in Count 2 (mail fraud), Staley would have been exposed to a base offense level of 7 under USSG § 2B1.1.  Similarly, in committing the conduct charged in Count 8 (aggravated identity theft), Staley would have been subject to a two-year mandatory minimum consecutive sentence, which is very roughly equivalent to 8 additional levels under the guidelines.  *See* 18 U.S.C. § 1028A.  To allow Staley the benefit of pleading only to Count 4 but to recognize the seriousness of the uncharged (admitted) conduct, the parties agreed to jointly recommend a five-level enhancement for uncharged conduct.  The Court should follow that recommendation.

### B. **The Sentencing Factors.**

#### 1. *The need for punishment and to reflect the seriousness of the offense.*

During an unprecedented global pandemic, Staley took advantage of the public's desperation to sell a combination of generic drugs in a concierge medicine package for

thousands of dollars for his own financial gain.  During his only fully recorded interaction with a potential customer, Staley made wild claims about the primary drug's effectiveness,[12] and then closed a deal for $4,000 for a package of drugs worth less than a few hundred dollars and unspecified "concierge services."   Later, Staley threw in a schedule IV controlled substance and a separate prescription drug as a kicker, with no associated medical examination of any kind for the UC or any of his family members—including his supposed minor children.[13]

In order to source the scarce drugs that would fuel his scheme, Staley filled a straw prescription by stealing his employee's identity; arranged to smuggle HCQ into the United States by mislabeling it as yam extract; and then lied about the entire arrangement (including the smuggling bit) when confronted by agents.  Crucially, when agents asked whether he would have made the kind of unequivocal guarantees he had actually made to the UC just days earlier, Staley denied it, adding, "That would be foolish."

Staley abused his trusted position as a physician in order to commit these crimes.  Only his status as a doctor—and his own medical experience as a military physician—allowed him to hold himself out as a trustworthy voice during trying times.  Only his ability to write prescriptions for a scarce drug that his customers believed might save them from a frightening pandemic allowed Staley to translate the risk into thousands of dollars.

This is very serious conduct.  Doctors are vested with enormous power in caring for their patients, who must trust their doctors' judgment and willingness to act in the patient's

---

[12]   The United States acknowledges that none of Dr. Staley's other customers recalled being told the same extreme claims Staley made to the undercover agent during their recorded interaction.  One customer recalled Staley telling her that HCQ was a "brilliant drug" and that he was "amazed" by it.  Similarly, Staley was recorded telling a potential British customer that Boris Johnson would be "completely cured" if he were taking HCQ, and his email to a customs broker described HCQ as a COVID-19 "cure."  Nevertheless, none of these statements rises to the level of the outlandish claims made to the UC.

[13]   At the same time, there is no evidence that any patient was harmed as a result of Staley's conduct—for example, by suffering adverse effects from taking HCQ.

best interest.  Abusing one's position as a doctor to profit from scared customers during a global pandemic is a severe offense that undermines the integrity of the entire medical profession.  Stealing a subordinate employee's personal information (and leveraging her own health condition) to write a straw prescription for a scarce drug to supply the scheme is a severe offense.  And lying to federal agents cover it all up just aggravates the offense further.

Staley will surely contend that his overriding motive was to *help* his customers and not deceive them, and no doubt that may have formed part of his consideration or at least his self-justification.  But the evidence shows that Staley didn't truly believe the claims he made about HCQ because he immediately disavowed them when interviewed by agents, calling such statements "foolish."  Instead, Staley's dominant motive of financial gain and rescuing his struggling business are clearly revealed in his conduct.  When he was beating the bushes for wealthy investors in his enterprise, Staley promised one to "triple your money in 90 days."  These are promises the Court usually hears from a charlatan operating a Ponzi scheme—not a physician embarked on a mission to save patients' lives.

### 2.   *The need for deterrence and to promote respect for the law.*

Most white-collar crimes are hard to detect and interdict.  Frauds committed by doctors are even more so because the very expertise and unreviewable judgment that cloaks a doctor's decision-making typically insulates their motives (and their methods) from scrutiny.  Indeed, in this case, if the FBI hadn't used a recorded undercover agent to discover the kinds of extreme claims that Staley made as part of his marketing efforts, it is likely that his conduct would never have been exposed.

Precisely because detecting and stopping these kinds of crimes is so difficult, it is especially important to impose a meaningful sanction that will deter others who are tempted to engage in them.  Put another way, a non-custodial sanction could well be viewed as a wrist-slap for a prominent practitioner of a powerful profession, when the Court should be concerned about sending precisely the opposite message.  General deterrence for a crime of this gravity, perpetrated by a doctor, requires a serious penalty.

### 3. *Staley's history and characteristics.*

The PSR contains a detailed discussion of Staley's personal history, which presents several undeniable mitigating factors, such as his military service and the absence of prior felony convictions.

There are also negative factors, however. Staley has used cocaine multiple times on pretrial release, and lied about his use the first time it was discovered. ECF 74. Specifically, he claimed his first positive drug test was due to a tea or a medical supplement he was taking, and only admitted cocaine use when confronted with detailed test results. The second time Staley tested positive for cocaine, he told his Pretrial officer that he had licked a AAA card he found in his wallet containing white powder. In none of his three rounds of positive drug tests did Staley admit use before returning a positive test. The United States anticipates that Staley may claim that his conduct with the UC in this case was influenced by Staley's drug use at the time.[14] Candidly, providing medical advice to a potential patient while under the influence of controlled substances has just as many aggravating aspects as mitigating ones, and on balance the United States does not view this as mitigation. The guidelines generally agree. *See* § USSG 5H1.4 ("Drug or alcohol dependence ordinarily is not a reason for a downward departure. Substance abuse is highly correlated with an increased propensity to commit crime.").

Concerning collateral consequences, the California state authorities appear poised to seek further adverse action against Staley's medical license, although the ultimate outcome of those proceedings is uncertain and Staley sought to plead guilty to Count 4 specifically because he believed it would improve his chances with the licensing board. The results of Staley's revocation proceedings before the DEA are also currently pending. Certainly, the

---

[14] Staley's DEA proceedings took place February 23, 2022: after he had tested positive for cocaine use twice in this case, but before Pretrial filed a public petition outlining his substance abuse. Staley never mentioned his cocaine use at that hearing; instead, he described himself as "riding on adrenaline" during his time running his "COVID-19 strike force." Exhibit 2 189:3–6.

Court should consider the effect of these collateral consequences in sentencing Staley, but it should also consider that licensure effects for white collar professionals who commit crimes are typically the natural effect of their conduct rather than a punishment per se.

In sum, the United States believes that the weight of Staley's mitigating factors is appropriately addressed by the parties' charge-bargain in this case, which partly relieves Staley from the burden of a two-year mandatory minimum sentence and the sentencing guidelines consequences of a plea to mail fraud.

## C.   Fine.

This financially-motivated crime warrants a financial penalty, and the parties have agreed to jointly recommend a fine of $10,000.00.  This is equivalent to a low end fine, assuming a fine range of $10,000 to $100,000 for offense level 17, which would have applied to the charges in the superseding indictment.  USSG § 5E1.2.[15]

Although Staley refused to provide financial information to Probation, *see* PSR ¶ 107, the Court should be comfortable that he has the ability to pay a fine, as well as the agreed-upon forfeiture judgment.  For example, Staley is currently participating in a residential substance abuse program in Rancho Santa Fe that describes itself on its website as providing "Luxury Rehab."

## D.   Forfeiture.

Staley was paid $4,000.00 by the undercover agent for the "treatment packs" he sold to the agent.  That money has never been recovered, and the parties have agreed to the entry of a money judgment in that amount.  ECF 58, 68, 70.[16]  Staley has also agreed to forfeit the drugs and capsule filling machine seized during the warrant search of Skinny Beach. The Court should confirm that forfeiture at sentencing.

---

[15]   Offense level 17 is calculated as (7/base offense level) + (2/abuse of trust) + (2/obstruction of justice) = 11 – (2/acceptance of responsibility) + (8/uncharged conduct for § 1028A) = 17.

[16]   The amount of the forfeiture does not include any money that Staley was paid by any of his other customers.

**III.**

**CONCLUSION**

For the reasons stated above, the United States respectfully requests that this Court impose a sentence of 12 months and one day in custody to be followed by three years of supervised release with all of the conditions ordered by Probation. The parties also jointly recommend a fine of $10,000.00 and forfeiture of $4,000.00 as well as the property identified in the forfeiture addendum.

DATED: May 20, 2022                    Respectfully submitted,

                                       RANDY S. GROSSMAN
                                       United States Attorney

                                       *s/ Nicholas W. Pilchak*
                                       NICHOLAS W. PILCHAK
                                       Assistant U.S. Attorney

                                       *s/ Jaclyn Stahl*
                                       JACLYN STAHL
                                       Assistant U.S. Attorney