**Patrick M. Griffin [SBN 276171]**
Griffin Law Office, APC
180 Broadway. Suite 1810
San Diego, CA 92101
Telephone: (619) 269-2131
Fax: (619) 344-0041
Patrick@GriffinLawOffice.com

Attorney for Defendant
JENNINGS RYAN STALEY

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JENNINGS RYAN STALEY,<br><br>Defendant. | Case No: 20-CR-01227-GPC<br><br>**DEFENDANT'S SENTENCING MEMORANDUM** |

## I. INTRODUCTION

The issue before the court is not whether Dr. Staley provided sound medical advice, it is whether his mistakes deserve a prison sentence in consideration of the facts of the case, his remarkable background, his treatment needs, and the severe collateral consequences. To understand the complex web of factors at play in this unique case requires an examination of Jennings Staley's past. A past that includes military service, service-related Post Traumatic Stress Disorder, and substance abuse. It also includes the emotions born from a business owner who was searching for answers to multiple problems brought on by the COVID-19 pandemic. It was this combination of these circumstances that drove Dr. Staley actions in this case.

As explained by Doctor Clark Clipson, the above factors lead Dr. Staley "to make grandiose, unrealistic claims and impulsive decisions" and to create "a poorly thought-out business plan." (Exhibit A: Report from Dr. Clark Clipson). Fortunately, Dr. Staley has taken the necessary steps to improve his mental health and reach sobriety. Currently, he is in a long-term residential program at Restoration Ranch. (Exhibit B - Letter from Restoration Ranch).

Dr. Staley is seeking a sentence of probation with the condition that he complete a drug treatment program.

## II. STATEMENT OF FACTS

### A. The COVID-19 Crisis

The case against Dr. Staley is set against the backdrop of an unprecedented public health crisis that caught the United States and the worldwide medical community unprepared. Like many others in the medical community, Dr. Staley immediately began researching available treatments and reviewing medical literature from around the globe. One treatment protocol appeared in the literature more than any other: hydroxychloroquine[1] taken in conjunction with the antibiotic, azithromycin.

Significantly, the relevant timeframe for this case is from mid-March 2020, when news reports showed the rapid spread of COVID-19 to the United States, to April 16, 2020, when Dr. Staley was charged. During this 28-day period, governments and medical professionals around the world were searching for answers on how to save the thousands of people who were dying every day.

---

[1] Hydroxychloroquine (HCQ), sold under the brand name Plaquenil among others, is a medication used to prevent and treat malaria in areas where malaria remains sensitive to chloroquine. Other uses include treatment of rheumatoid arthritis, lupus, and porphyria cutanea tarda. *See* The American Society of Health-System Pharmacists. (2020). (available at https://www.drugs.com/monograph/hydroxychloroquine-sulfate.html)

In late March 2020, hydroxychloroquine was being embraced by doctors across the world as the leading treatment for COVID-19. A survey by Sermo[2] of 6,200 physicians found hydroxychloroquine to be the most commonly prescribed treatment against COVID-19. *See* Sermo, *Largest Statistically Significant Study by 6,200 Multi-Country Physicians on COVID-19 Uncovers Treatment Patterns and Puts Pandemic in Context* (2020) (available at https://www.sermo.com/press-releases/largest-statistically-significant-study-by-6200-multi-country-physicians-on-covid-19-uncovers-treatment-patterns-and-puts-pandemic-in-context/).

During this time, countries began to stockpile hydroxychloroquine, including the United States, India, and China. In fact, India's government recommended people take it as a prophylaxis. *See* India National Taskforce for COVID-19 Advisory on the use of hydroxy-chloroquine as prophylaxis for SARS-CoV-2 infection (available at https://www.mohfw.gov.in/pdf/AdvisoryontheuseofHydroxychloroquinasprophylaxisforSARSCoV2infection.pdf).

Additionally, during this timeframe, hydroxychloroquine was repeatedly touted by the executive branch and media outlets. Multiple peer reviewed studies supported the use of hydroxychloroquine as a treatment for COVID-19. The leading peer reviewed study prior to April 16, 2020, which was published by Dr. Philippe Gautret in the International Journal of Antimicrobial Agents, found that "100% of patients treated with hydroxychloroquine and azithromycin combination were virologically cured." *See* Gautret, P., (2020). Hydroxychloroquine and Azithromycin as a Treatment Of COVID-19: Results of an Open Label Non-Randomized Clinical

---

[2] Sermo is the world's largest healthcare data collection company with 1.3 million health care practitioner panel members. Sermo is also a global social platform for physicians that fosters impactful peer-to-peer collaboration and discussions through meaningful insights, data, and trends.

Trial. *International Journal of Antimicrobial Agents*, 105949. (available at. https://doi.org/10.1016/j.ijantimicag.2020.105949.) at 3.3.

In late March 2020, the use of these medications became politicized, and the underlying medical literature was drowned out by a media frenzy. Dr. Staley became caught up in this media frenzy and spent an inordinate amount of time consuming media reports about the efficacy of hydroxychloroquine.

### B. Dr. Staley Seeks to Obtain Hydroxychloroquine to Treat COVID-19

In late March and early April 2020, both the DOJ and Dr. Staley set out to obtain hydroxychloroquine to treat COVID-19. On March 31, 2020, the DOJ purchased bulk orders of Hydroxychloroquine. Daily Beast, *The Bureau of Prisons Just Bought a Ton of Hydroxchloroquine, Trump's COVID-19 Miracle Drug* (4.6.2020) (available at https://www.thedailybeast.com/the-bureau-of-prisons-just-bought-a-ton-of-hydroxychloroquine-trumps-covid-19-miracle-drug).

At the same time the DOJ was purchasing hydroxychloroquine to treat COVID-19, Dr. Staley began receiving emails from licensed United States pharmacies advertising COVID-19 treatment kits which contained hydroxychloroquine. Dr. Staley followed the example of these pharmacies and decided to sell similar treatment kits, but with the added feature of on-demand telehealth services from a physician.

The DOJ's hydroxychloroquine procurement carried with it the force of the federal government. While the federal government was placing bulk orders, medical professionals on the ground were left scrambling. In early April 2020, it was nearly impossible for a doctor or retail pharmacy to obtain hydroxychloroquine. Given the shortages, Dr. Staley turned to other marketplaces and sources for procurement. He put out numerous requests to

various distributors but only one indicated it had hydroxychloroquine in stock and ready to ship. The vendor was through the online marketplace Alibaba, based out of China. Dr. Staley was connected to an Alibaba broker who represented that he had hydroxychloroquine in stock but that he needed to label it as "yam extract." (Pre-Sentence Report "PSR" ¶ 11). It was later learned that the Alibaba broker was running a scam and never shipped or intended to ship hydroxychloroquine to Skinny Beach.

Dr. Staley did not set out to deceive the United States Customs, the Alibaba representative saw Dr. Staley as a mark, and the Alibaba representative is the one who suggested the shipment be labeled as "yam extract." Dr. Staley agreed to this suggestion by the Alibaba representative and his agreement is the sole factual predicate for his conviction of the 18 U.S.C. § 545 customs violation.

### C. Skinny Beach Offers 24/7 Telehealth Medicine and COVID-19 Medications

In early April 2020, Dr. Staley set out to provide medical services that were in high demand: on-demand concierge medical treatment during a pandemic. Dr. Staley began offering COVID-19 treatment packs via telemedicine. Dr. Staley was not merely dispensing medications. In fact, the medications made up less than 10% of what was being sold or advertised to patients. His services included telehealth medicine for 90 days, other medications, supplements, at home testing, home visits in San Diego County, and condition management (with pulse oximeter delivered to all patients). These individual kits were advertised for between $495 and $595. In addition to these standard kits, Dr. Staley temporarily offered a VIP family kit (4+ kits sold as one package) for $3,995. Only two-family kits were ever sold one of which was undercover agent for the Federal Bureau of Investigation ("FBI"). The kits had several other add on options, including IV treatments,

zinc injections, and hyperbaric oxygen treatments. The fair market value for 24/7 telehealth access for 90 days alone exceeded the cost of an entire COVID-19 kit.

Skinny Beach advertised the COVID-19 kits with two emails that were distributed to its mailing list of past patients and by several posts to the Skinny Beach social media accounts. None of these outreaches contained any promises or guarantees. The dispensed kits all contained information sheets printed directly from the Food and Drug Administration's ("FDA") website. These FDA information sheets explained the pros and cons of each medication, instructions for administration, drug interactions, usage in pregnancy advisements, dosing information, and warnings. Dr. Staley's intent for marketing kits was to cater to individuals who were legitimately concerned about even going to the grocery store. These patients would be able to remotely order these kits and in the event the pandemic worsened, or they became ill, they would have immediate access to a doctor and the leading medications at the time. Dr. Staley now fully understands that his plan to offer COVID-19 services was flawed and conducted in a rushed, unprofessional manner.

Dr. Staley interacted with approximately 45 individuals for COVID-19 kits. **A key fact in this case is that there are no actual victims. No real patient or customer believes they were defrauded.** The Government and Probation agree on this issue. (PSR ¶ 39: "no victims … were defrauded by STALEY, with the exception of the UC"). Each patient had researched the medications and sought out Dr. Staley to procure the medications and on-demand medical care in case they contracted the virus.

### D. The FBI Targets Dr. Staley and Skinny Beach for Criminal Prosecution

The political and media firestorm surrounding hydroxychloroquine caused members of the community to notify local news organizations once Skinny Beach sent out its first newsletter pertaining to the COVID-19 kits. This led to ABC10 running multiple stories on Skinny Beach's marketing of the medications as part of its 24/7 telehealth concierge package.

After viewing the ABC10 stories, the FBI opened a secret investigation into Skinny Beach and Dr. Staley. The FDA or FCC did not send Dr. Staley a cease-and-desist letter or notify Skinny Beach that selling the same medications being touted by the executive branch may result in a criminal indictment in federal court. The FBI elected <u>not</u> reach out to Dr. Staley and explain that if Dr. Staley continued to follow the lead of the executive branch, he may be committing a federal crime. Rather, the FBI sent in a trained undercover agent (UC) to pose as a prospective patient.

The FBI's UC had several communications with employees of Skinny Beach. The UC claimed to be an investment fund manager who wanted to purchase a $3,995 VIP family concierge COVID-19 kit. The UC explained that his wife, three kids and elderly father were interested in the kit. The UC arranged for an office visit for the entire family and for Dr. Staley to call him prior to the office visit. During the phone call with the UC, Dr. Staley believed he would be meeting with the UC and his family at the Skinny Beach office the next day. Dr. Staley did not consider the free-flowing conversation with the friendly and inquisitive UC to be the totality of their interactions. Rather, he viewed it as merely an introduction to later be followed up with an official in-office medical exam where he would explain the medications in a proper medical setting.

The free-flowing conversation lasted fifty-five minutes and touched on several topics that would not be part of a normal medical exam. These topics included: a discussion about Fox News personalities, how the COVID-19 crisis relates to a wartime scenario, a discussion about where Dr. Staley is from and where he went to school, a back and forth regarding personal protective equipment procurement, and the UC explaining how COVID-19 has impacted his investment strategies. The UC set out to get Dr. Staley talking. Dr. Staley complied by providing the UC with what amounted to a stream of consciousness regarding what Dr Staley believed <u>at the time</u> to be the answer to the COVID-19 crisis.

The conversation concluded with Dr. Staley saying, "I'll see you tomorrow." However, the UC canceled the in-office exams for his family and completed a transaction for the VIP family kit over the phone the next day. Dr. Clipson details Dr. Staley's state of mind during this pivotal time frame and provides an explanation for Dr. Staley's grandiose claims to the UC that led to his arrest. (*See* Exhibit A).

### III. **DR. STALEY'S BACKGROUND AND HISTORY**
#### A. **Upbringing and Military Service**

Jennings Staley, M.D., was born and raised in Decatur, Illinois. He had a difficult upbringing, which included living in impoverished conditions during his formative teenage years. PSR ¶ 79. He graduated from Southern Illinois University with a B.A. 1997 and a M.D. in 2001. After completing an internal medicine residency in Minnesota, he was commissioned as an officer in the United States Air Force (USAF). Dr. Staley, who ultimately earned the rank of Major, was deployed to Iraq in 2006 as a combat medic. Dr. Staley was responsible for the management of critically ill Coalition Forces and Iraqi civilian patients. Thereafter, he developed the first Acute Coronary Syndrome research project in the Iraq combat theater and personally

managed the transfer of nearly 200 Iraqi Army/Police/Civilian and U.S. patients.

Dr. Staley's combat service earned him numerous commendations, including the USAF Medal of Commendation for Outstanding Service in Operation Iraqi Freedom and the Air Force Service and the Air Force Organizational Excellence Award (AFOEA). Dr. Staley's service was so remarkable that in 2006 his hometown newspaper published a front-page news story chronicling his time on the front lines. (*See* Exhibit E - Herald & Review, Decatur Native Finds Rewards As Air Force Doctor In War Zone (2006). The horrors of war experienced by Dr. Staley are detailed in Dr. Clipson's report. (*See* Exhibit A).



*"The opportunity to save the lives of an Iraqi child with simple surgery not available in their own country is very rewarding." – Dr. Staley*

Dr. Staley spent the remainder of his time in the USAF stationed in Mississippi and Texas where he improved acute care access for patients who were dispersed because of the Hurricane Katrina disaster. After being honorably discharged from the USAF, Dr. Staley became Board Certified by the American Board of Internal Medicine, was an Assistant Clinical Professor of Medicine at the University of California San Diego, and was employed as a full time Level II Emergency Physician for the Veterans Healthcare system.

//
//
//
//

### B. Post Military

The stresses and trauma of serving in a war zone and in an emergency, room led Dr. Staley to a career change in 2010. Eventually, he started the Skinny Beach Med Spa in San Diego. He met his wife, Amanda Staley in 2012. The two married in 2013 and have two children, ages 5 and 7. Dr. Staley led an incredibly accomplished and diverse medical career. His resume tells the story of a man with a strong work ethic and a desire to help others. (Exhibit C: Jennings Staley Resume).



### C. Comprehensive Phycological Evaluation

Dr. Clark Clipson conducted a compressive psychological evaluation of Dr. Staley on November 18, 2021. Dr. Clipson's report provides insight on Dr. Staley's background. (*See* Exhibit A). According to Dr. Clipson, Dr. Staley suffers from the following psychiatric diagnoses: (1) major depressive disorder (recurrent, mild); (2) posttraumatic stress disorder ("PTSD"); (3) stimulant use disorder (cocaine, severe, in early remission); (4) alcohol use disorder (mild, in early remission); and (5) problems related to legal

circumstances. *Id.* at 3. Dr. Clipson cautions that Dr. Staley "remains at risk of depression and self-harm if faced with further losses or challenges to his character structure." Id.

This background helps explains Dr. Staley's wrongful justification for his actions. As Dr. Clipson explains, at that time, "Dr. Staley was likely feeling threatened by the loss of his business because of shutdowns related to the pandemic. This impacted him financially but also emotionally as it deprived him of a way of meeting his needs for admiration derived from his patients." (*See* Exhibit A at 3). Further complicating this is that Dr. Staley "was experiencing symptoms of PTSD and abusing drugs almost daily." *Id.* According to Dr. Clipson, "[t]hese factors along with his need to be a 'hero' led him to make grandiose, unrealistic claims and impulsive decisions as he took ideas voiced in the White House and on conservative news outlets and tried to turn them into a poorly thought-out business plan." *Id.*

Fortunately, the psychiatric issues leading to Dr. Staley's wrongful conduct are treatable. Specifically, Dr. Clipson has five recommendations, which could be incorporated to Dr. Staley's conditions of release. The following are the relevant portions of Dr. Clipson's recommendations:

(1) Continue substance abuse treatment;

(2) Seek treatment for PTSD and depression;

(3) Seek psychiatric treatment, which may include appropriate medications;

(4) Seek long-term and individual psychotherapy treatment; and

(5) Continue to be monitored for suicidal ideation.

(See Exhibit A at 4).

### D. Continued Family and Community Support

Dr. Staley received over thirty letters from family members and friends, all of which voiced their ongoing support. A sample of these letters are attached. The letter from his mother, Carol Staley, contains a story about Dr. Staley. When he was eight years old, a schoolmate was in an accident which resulted in both legs being broken and placed into casts. (*See* Exhibit D - Letter from Carol Staley). As Mrs. Staley recalls, Dr. Staley was the only classmate who volunteered to aid and assist with the child. *Id.* His aunt, Linda Hooge, describes Dr. Staley as "a very responsible person, a successful physician, a loving husband and father." (*See* Exhibit D).

Dr. Staley's uncle, Doug Lichtenberger describes Dr. Staley as an achiever and a person who always goes beyond ordinary:

> "I truly believe Jennings has a good heart for helping others; good head for developing ideas to make life/health better for others; and, a beautiful young family that needs him to care for them. Jennings is always full of ideas and the ideas I've heard him talk about were always for the good of others" (See Exhibit D– Letter from Doug Lichtenberger).

Dr. Zulfiqar Shah, an Air Force colleague of Dr. Staley explains how Dr. Staley helped him through deployment in Iraq:

> "Jennings always took great care of his patients and had a great rapport with staff and patients alike. He was an integral part of our hospital and was a great educator to young doctors and Residents. Jennings was deployed to Iraq in Operation Iraqi Freedom a few months before I was, and he was a great support to me when I deployed. He helped me acclimate in a very difficult environment. I cherish his camaraderie and friendship especially during those times" (See Exhibit D – Letter from Dr. Zulfiqar Shah).

//

//

Sadie McNutt, a former employee of Dr. Staley's says that Dr. Staley has always been helpful and supportive to her as an employer and a friend:

> "He lives a moral life we can all aspire to achieve and has set a high standard of values he is dedicated to each day. He has taken many measures to ensure he will stay on this path by increased faith and spirituality while he takes daily efforts to build a better future for not only his family but for all those in his life. He has shared his feelings that speak from his heart turning any adversity into greater kindness, increased compassion, and with love and honestly in everything that he does" (See Exhibit D – Letter from Sadie McNutt).

## IV. THE ADVISORY SENTENCING GUIDELINES SUPPORT THE REQUESTED SENTENCE

A sentence of three years of probation that includes the following special conditions of release is just and reasonable: completion of a residential drug treatment program, home confinement, and psychiatric counseling and treatment. It is also an available sentence under the Sentencing Guidelines.

### A. The Base Offense Level

The parties and the probation officer agree that under USSG § 2T3.1(a)(3) the base offense level is 4 because the loss in taxes is less than $200.

### B. Upward Adjustments

The parties and the probation officer agree that two-level upward adjustments apply: (1) abuse of trust (USSG § 3B1.3) and (2) obstruction of justice (USSG § 3C1.1) are appropriate.

### C. Downward Adjustment

The parties and the probation officer agree that a two-level downward adjustment for acceptance of responsibility pursuant to USSG § 3E1.1(a) is appropriate.

### D. Upward Departure

The parties agree that a five-level upward departure pursuant to USSG § 5K2.0 for uncharged conduct is fair, reasonable, and just. The probation officer advocates for a higher upward departure of nine-levels. For the reasons set forth in the objections to the Presentence Report, Dr. Staley moves this Court to reject the probation officer's request and to follow the parties' recommendation.

### E. Downward Departures

Dr. Staley's military service warrants a four-level downward departure pursuant to USSG § 5H1.11. The probation officer acknowledges that this departure is appropriate, but only advocates for a two-level reduction. PSR at 24-25. Section 5H1.11 provides that "[m]ilitary service may be relevant in determining whether a departure is warranted, if the military service, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines." As the probation officer found:

> As a combat trauma physician, he reportedly witnessed some of the most difficult and gruesome aspects of war, outside of actually participating in combat. These horrible experiences likely resulted in his PTSD condition, which he admitted led to destructive behaviors. It appears STALEY's reported military service and related experience are present to a degree which differentiates it from typical cases covered by the guidelines.

PSR ¶ 24-25. The horrible experiences, include, as described by Dr. Clipson, "having to euthanize Iraqi citizens." (*See* Exhibit A at 3).

Dr. Staley's service is remarkable when compared to other similarly situated veterans. In 2019, veterans made up nearly six percent of all inmates in the custody of the Bureau of Prisons. See United States Sentencing Commission, Federal Offenders Who Served in the Armed Forces (October 2021) https://www.ussc.gov/sites/default/files/pdf/research-and-

publications/research-publications/2021/20211028_armed-forces.pdf. This number is both shocking and alarming. "Of the 1,869 veteran offenders sentenced in fiscal year 2019, more than one-in five (20.4%, or 381) had participated in a combat operation. Veterans of the war in Iraq were the most common. Of the 381 veterans who had served in a combat zone, 168 had served in Iraq." Id. Thus, unlike most veterans facing federal sentencing, Dr. Staley experienced the trauma of war.

Moreover, Dr. Staley has established both that he has PTSD and that it is a result of his service to the country. According to the VA, Dr. Staley has "[s]ervice connection for post-traumatic stress disorder has been established as directly related to military service." (See Exhibit F: VA Diagnosis and Disability Rating) (citing 38 CFR 3.303 and 38 )

Dr. Staley's PTSD symptoms are exasperated by an addiction to drugs and alcohol. An addiction he developed as a coping mechanism to deal with PTSD and the atrocities he saw during the war. As. Dr. Clipson explains: Dr. Staley "retreated into substance abuse and work as a way of avoiding the negative thoughts and feelings he experienced, while relying on these coping mechanisms to promote feelings of competence, superiority, and invincibility." (*See* Exhibit A at 3).

Dr. Staley's exemplary service during the war does not excuse his conduct in this case. It helps explains, however, how Dr. Staley was able to justify his actions over a month during the start of the global pandemic. His military conduct and the price he paid should result in a sentencing reduction, either as a four-level downward departure under Section 5H1.11. In the absence of a downward departure under the guidelines, these facts are also appropriate for a downward variance.

If this court finds either that a four-level downward departure under Section 5H1.11 is not appropriate, Dr. Staley moves this Court for a departure based on a combination of circumstances under USSG § 5K2.0.

Circumstances warranting a departure in this case include: (1) Dr. Staley's military service; (2) that this was victimless crime; and (3) the loss of Dr. Staley's medical license. These factors alone should result in a four-level downward departure or a downward variance from the guidelines.

### F. Total Offense Level and Guideline Range

The resulting guideline range for a Total Offense Level of 7 in a Criminal History Category I is 0 to 6 months. It also in a Zone A. Because the sentence falls within Zone A, and is a Class C felony, a sentence of probation is warranted under the Guidelines. See USSG § 5B1.1. Moreover, even if this Court finds that the resulting Guideline range is not in a Zone A or Zone B, it still has the discretion to impose a probationary sentence.

## V. SECTION 3553(A) AND COLLATERAL CONSEQUENCES

The consequences of this case extend far beyond this courtroom. Dr. Staley is no longer able to practice medicine, he faces financial ruin, and he has lost his standing in his community. The significance of Dr. Staley losing his ability to practice medicine because of this conviction comes into sharp focus when reviewing Dr. Staley's resume. Dr. Staley has now lost a lifetime of impressive professional achievements and experiences. Dr. Staley's identity and self-image were based on his ability to help others through medicine. He has now put his family in a dire financial situation because of his inability to continue practicing medicine.

Dr. Staley appears before this court as a broken man, who is trying to stay on the path to recovery. When looking at Dr. Staley now, it is easy to overlook the young man from Decatur, Illinois who came from such humble beginnings. Even with his efforts to rebound from his mistakes in this case, his reputation will be forever ruined. A Google search of "Jennings Staley" yields page after page of articles describing him as a COVID-19 scam artist. There are hundreds of articles describing Dr. Staley as a COVID-19 fraudster, but no articles that explain that the fraud charge was dismissed.

Actions of course have consequences, and Dr. Staley raises these collateral consequences not to compel sympathy but to explain that the punishment for his conduct will permeate his life long after this court case concludes.

## VI. CONCLUSION

Dr. Staley is on the right path. He is in a residential drug treatment program. He is receiving phycological care for service-related PTSD. And he is looking forward to starting a new career, which will sadly not involve treating patients. For Dr. Staley, the requested sentence of three year of probation, which includes—amongst others—the following special conditions of release: (1) enter and complete a residential drug treatment program at the direction of United States Probation; (2) serve any custody in home confinement; and (3) complete 100 hours of community service. This sentence appropriately balances all sentencing factors and results in a just sentence.

Dated: May 20, 2022

Respectfully submitted,

/s/Patrick M. Griffin
PATRICK M. GRIFFIN
Attorney for Defendant
JENNINGS STALEY